**In re GENERAL INDUSTRIES, INC., Debtor.**

**GENERAL INDUSTRIES, INC. and Official Creditors Committee, Plaintiffs,**

**v.**

**Raymond E. SHEA, Defendant.**

**Bankruptcy No. 86–40152–WOR.
Adv. No. 87–4025.**

United States Bankruptcy Court,
D. Massachusetts.

Oct. 30, 1987.

Darragh Kasakoff, Seder & Chandler, Worcester, Mass., for Creditors' Committee/plaintiff.

Steven Kressler, Kressler, Kressler & Pitnoff, Worcester, Mass., for debtor/plaintiff.

John W. Spillane, Worcester, Mass., for Raymond E. Shea/defendant.

## OPINION

JAMES F. QUEENAN, Jr., Bankruptcy Judge.

The defendant, Raymond E. Shea ("Shea"), foreclosed upon real estate and equipment of General Industries, Inc. (the "Debtor"), and was the successful bidder at the separate auctions which were held. The Debtor and its official creditors committee have instituted this adversary proceeding, contending that the foreclosure sales were fraudulent transfers under § 548(a) of the Bankruptcy Code (11 U.S.C. § 548)[1] because the sales were made for "less than a reasonably equivalent value" within the meaning of the statute. The Court holds that Shea is the recipient of fraudulent transfers. We set forth here our findings of fact and rulings of law.

## I. PRINCIPAL FACTS

In 1980, one Louis E. Bernard was the holder of a 1975 recorded mortgage upon the Debtor's manufacturing plant and office in Rutland, Massachusetts. The mortgage secured payment of the Debtor's $35,-000 note to Bernard dated March 25, 1975, due one year from that date and bearing simple interest at 12% per annum. The note being in default, Bernard scheduled a foreclosure sale in August of 1980. Shea was then a former officer and director of the Debtor, holding a small stock interest which he still retains. To avert the sale, Shea paid Bernard $20,882.21. This amount was the total of the principal, interest and legal expenses then due on the note; it reflected a payment of $25,000 made on October 13, 1979 and one for $10,000 made on January 18, 1980, both of which Bernard properly applied first to interest and then to principal. Bernard assigned the note and mortgage to Shea's son, Harold M. Shea. At the same time, for no additional consideration, Bernard assigned to Shea's son Bernard's interest in the Debtor's equipment represented by filed financing statements. Shortly thereafter, Shea made two loans to the Debtor for which he was given the Debtor's demand notes payable to him in the sums of $4,500 and $5,000 dated, respectively, September 30, 1980 and November 6, 1980. In 1984, Shea succeeded to his son's interests in the 1975 note, the mortgage securing the note, and the filed financing statements.

The Debtor, despite demands, failed to make any payments to Shea on any of these notes. In 1984, Shea scheduled and cancelled two foreclosure sales. He also brought suit on the two smaller notes, and was met by counterclaims of the Debtor; a lis pendens was filed with the real estate records to reflect this suit. On January 10,

---

1. Section 548(a) provides:

 (a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—·

 (1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

 (2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

 (B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

 (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

 (iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

1985, the parties signed an agreement in an attempt to settle their differences. They agreed that the total debt due on the March 31, 1975 note was $36,000 in principal, plus interest through February 1, 1985 of $734.26 and legal and constable expenses of $2,500, making a total debt as of February 1, 1985 of $39,234.26. (At trial, Shea's attorney stated that the $36,000 figure should have been $35,000, the original principal amount of the note; no party offered any explanation as to how this principal balance could be greater than the note's August 1980 balance of principal, interest and legal expenses). The parties also agreed in their January 10, 1985 agreement that a total of $17,963.73 was owed in principal, interest and legal expenses on the two smaller notes, and that the total indebtedness on all three notes was $57,197.99. The Debtor agreed to pay this total debt over a one year period at 10% interest in twelve monthly payments of $5,028.81 each, with Shea retaining the right to collect the full amount due under the three notes in the event of the Debtor's default in the payments promised in the agreement.

Only three monthly payments were made under the agreement. Shea accordingly proceeded to foreclose his real estate mortgage. A public auction was held on September 18, 1985. An individual named Tonelli had by then joined with one or more of the Debtor's employees in an effort to start a new business using the Debtor's property. He appeared at the sale and expressed an interest in purchasing the real estate and equipment. Shea's lawyer told him that only the real estate had been advertised for sale at that time, so that only the real estate could be sold. Tonelli opened the bidding for the real estate at $5,000; Shea then bid $30,000. The bidding closed, and Shea purchased the property.

The price paid for the real estate was the $30,000 bid plus accrued real estate taxes having priority over the mortgage in the sum of $6,952.16, making a total purchase price of $36,952.16. Shea contends that the price also included federal and state taxes for which liens had been filed on the property. But these filings were made after the recording of the mortgage, so that the foreclosure sale was free of them, despite the apparent opinion of Shea's title examiner to the contrary. *Milton Savings Bank v. United States*, 345 Mass. 302, 187 N.E.2d 379 (1962). The filed lis pendens also has no effect on the purchase price for the same reason. Shea's contention that potential environmental problems should be taken into account in calculating the price is also without merit. Although any sums spent by the Commonwealth in the removal of hazardous waste would be secured by a lien on the property having priority over the mortgage (MASS. GEN.L. ch. 21E, § 13), the Commonwealth has spent no such sums on the property, nor is there any indication that such expenditures will be forthcoming.

Shea later foreclosed upon the Debtor's equipment through a public auction sale held on February 6, 1986. He was the only bidder, purchasing the equipment for $5,000.

Creditors' Committee counsel, who tried the case for the two plaintiffs, asserts that neither the $36,952.16 paid for the real estate nor the $5,000 paid for the equipment constitutes "reasonably equivalent value" for the respective properties within the meaning of § 548(a). The Committee proceeds upon the principle first announced in *Durrett v. Washington National Insurance Co.*, 621 F.2d 201 (5th Cir.1980), that a mortgage foreclosure sale at a substantially less than fair market value (57.7% in *Durrett*) is a transfer for less than "reasonably equivalent value" and is therefore fraudulent if made within one year prior to the petition filing date while the debtor was insolvent or was thereby rendered insolvent. Creditors' Committee counsel also relies upon *Ruebeck v. Attleboro Savings Bank (In re Ruebeck)*, 55 B.R. 163 (Bankr. D.Mass.1985), a decision by another bankruptcy judge in this district which represents a variation of *Durrett*. *Ruebeck* scrutinizes the price obtained, but also emphasizes the extent of the preparatory foreclosure sales efforts in its determination of "reasonably equivalent value." We turn first to the question of value, perhaps the

most important single factual issue that must be resolved in connection with any legal analysis.

## II. VALUE OF REAL ESTATE AND EQUIPMENT

■ The parties' experts, predictably, differed greatly in their opinions concerning the value of the real estate. Plaintiff's expert, Mr. Segal, opined that the Debtor's plant and office had a fair market value of $95,000 at the time of foreclosure. Shea's principal expert, Mr. Barnard, expressed the opinion that its value was then $59,800. Mr. Newcomb, another expert called by Shea, confirmed that on May 20, 1984, he stated to Shea that he believed the property to be then worth between $45,000 and $48,000; he readily conceded that this opinion was not the result of the standard preparatory procedure he would employ in giving a "formal" appraisal. Shea, who qualified as an expert, gave an opinion of $35,000 to $40,000 as of July of 1984, when a prior abortive foreclosure sale took place.

The Court is not heavily persuaded by Mr. Newcomb's appraisal because it was only an informal one based upon no specific sales prices of similar property. Mr. Newcomb was quite forthright in stating it was an informal appraisal. The Court is even less persuaded by Mr. Shea's opinion, for the same reason and because of Shea's interest in the matter. The appraisals of Mr. Segal (for the plaintiffs) and Mr. Barnard (for Shea) contain both persuasive aspects and deficiencies. Mr. Segal gave fairly extensive comparable sales data, but he failed to discount the per square foot value to reflect the fact that these sales involved properties which were located in cities and not the rather remote town of Rutland. Mr. Segal's opinion also failed to take into account the fact that the locus depends for its water supply upon a well owned by an abutter, and that the building is in need of a roof and a more modern heating system. Mr. Segal, furthermore, failed to reflect expenses for taxes, maintenance, and insurance in using the capitalization of income method. Mr. Barnard did give comparative sales data for sales in Rutland and nearby towns. He was frank in saying, however, that this data was for sales of properties which are so far superior to the locus as to require that the sales price per square foot be discounted by 60% to 70% to arrive at a value of the subject property. Such comparative sales data, whatever the percentage of discount, is not helpful because of the substantial difference in the nature and quality of the properties. The Court agrees with Mr. Barnard, however, that the market data method is the most practical approach to valuation because of the age and condition of the building. Mr. Barnard's appraisal also seems correct in taking into account the condition of the property and the expenses that would have to be expended on it.

The Court concludes that Mr. Segal's comparative sales data should be used, but that the price of approximately $10 per square foot for these sales should be discounted by 25% to $7.50 per square foot to arrive at our value, in order to reflect the difference in values of comparable properties located in a large city and a remote town. There being 9,200 square feet of building space on the property, the Court finds that the property has a value of $70,000.

■ The plaintiffs' expert, Mr. Berman, was the more experienced of the two experts who testified on the value of the equipment, so that we regard his opinion as more persuasive. He opined that the equipment had a value of approximately $20,000 in liquidation, meaning that this is the price obtainable at a well-publicized and properly-run public auction. He was also of the opinion that the equipment had a so-called "in place" value of $53,000, which is the price he believed would be obtainable if the equipment were sold to a purchaser who intended to leave it in place and use it in a business operated at the same premises. The Court excluded this opinion from evidence, on the ground that the likelihood of the equipment being sold to such a purchaser is too slim to justify such a standard of valuation. Moreover, although Shea has left the equipment in the building, he has not used it in the operation of any business.

It has only had occasional use by semi-retired officers of the Debtor, with no consideration being paid to Shea. The Court therefore concludes that the equipment had a value of $20,000 at the time of the equipment auction on February 7, 1986.

In summary, therefore, the Court finds that the Debtor's real estate was worth $70,000 at the time of the foreclosure, and that the equipment sold at auction in February of 1986 was then worth $20,000. Thus the real estate and equipment were sold at 53% and 25%, respectively, of their value.

### III. FORECLOSURES AS FRAUDULENT TRANSFERS

#### A. *General Principles*

In *Durrett v. Washington National Insurance Co.*, 621 F.2d 201 (5th Cir.1980), real estate worth $200,000 was sold at a public foreclosure auction for $115,400, or 57.7% of its value. The court ruled that this was not "fair consideration" or a "fair equivalent" under § 67(d) of the former Bankruptcy Act; it held that the foreclosure sale was therefore a fraudulent transfer. The court recognized that under § 67(d) the transfer must occur within a year prior to the bankruptcy filing, and that in the case before it only the foreclosure sale and not the initial mortgage grant had occurred during the one year period. It ruled, however, that the broad definition of transfer under § 1 of the prior Act, which expressly included involuntary transfers, was sufficient to encompass a foreclosure sale. It viewed a transfer under a mortgage as a continuing event which is not final until the foreclosure sale. *See also Abramson v. Lakewood Bank & Trust Co.*, 647 F.2d 547 (5th Cir.1981), where the same court relied upon *Durrett* in reversing a summary judgment it entered in favor of a mortgagee.

*Durrett* has been met by opposing views from other courts, principally from the Ninth Circuit Bankruptcy Appellate Panel and the Court of Appeals for the Ninth Circuit. *Lawyers Title Insurance Corp. v. Madrid (In re Madrid)*, 21 B.R. 424 (Bankr. 9th Cir.1982), a decision of the appellate panel, was governed by the unamended provisions of § 101(50) and § 548 of the Bankruptcy Code, which were quite similar to those contained in § 1 and § 67(d) of the former Act. The appellate panel believed that fraudulent transfer principles under federal bankruptcy law should be harmonized with state foreclosure law, and expressed concern about bankruptcy courts upsetting settled state practices. It held that the price obtained at a non-collusive foreclosure sale properly conducted under state law is irrebuttably presumed to be "reasonably equivalent value" within the meaning of § 548(a)(2). On appeal, the Ninth Circuit agreed with the appellate panel that the *Durrett* rule has the undesirable effect of changing settled commercial and real estate law which has long been within the domain of the states. It affirmed the panel, but for a different reason: that a foreclosure sale during the one year period was not a transfer within the meaning of § 548. *Lawyers Title Insurance Corp. v. Madrid (In re Madrid)*, 725 F.2d 1197 (9th Cir.1984). The court conceded that § 101 gathered within its sweep involuntary transfers, just as had § 1 of the prior Act. But it regarded as more controlling § 548(d)(1), which provides that a transfer is made when it has been perfected against a bona fide purchaser. In the case of mortgages, perfection occurs when the mortgage is recorded. A concurring opinion relied upon § 548(a)(1), which speaks of the "debtor" receiving less than reasonably equivalent value. The concurring opinion reasoned that this provision requires the debtor to participate in the transfer in order for the transfer to be fraudulent, a participation which is obviously lacking in a foreclosure sale. *In re Madrid*, 725 F.2d at 1203–04 (Farris, J., concurring).

The transfer issue has been resolved by Congress in the 1984 Amendments to the Bankruptcy Code. The definition of transfer contained in § 101(50) now includes not only involuntary transfers but also "foreclosure of the debtor's equity of redemption." Section 548(a) was also amended to

specifically refer to the debtor "voluntarily or involuntarily" making transfers. These changes are determinative on the question of whether Congress intended that § 548 cover foreclosure sales, even in the absence of committee reports and despite some attempt at post-enactment legislative history. *See Verna v. Dorman (In re Verna)*, 58 B.R. 246, 250–51 (Bankr.C.D.Cal.1986); *Ruebeck v. Attleboro Savings Bank (In re Ruebeck)*, 55 B.R. 163, 167 & n. 5 (Bankr.D. Mass.1985). We are left, however, with resolution of the issue framed by the conflicting opinions of the Fifth Circuit in *Durrett* and the Ninth Circuit Bankruptcy Appellate Panel in *Madrid.*

Some courts have adopted a middle ground between *Durrett* and the appellate panel decision in *Madrid,* analyzing each foreclosure sale on a case by case basis. The Eighth Circuit in *First Federal Savings & Loan Association v. Hulm (In re Hulm)*, 738 F.2d 323 (8th Cir.1984), *cert. denied* 469 U.S. 990, 105 S.Ct. 398, 83 L.Ed.2d 331 (1984), vacated a decision of the bankruptcy court which followed the appellate panel in *Madrid.* It concluded that a regularly conducted foreclosure sale should not be automatically deemed to produce a reasonably equivalent value for the purposes of § 548(a). It remanded the case for an evidentiary hearing on the reasonable equivalence of value received, noting that § 548 by its terms clearly applied to state foreclosure sales. The Eighth Circuit refused to allow the policy considerations in *Madrid* to sway its result, stating that such considerations were best left to Congress. *Hulm,* 738 F.2d at 327. A few courts have found this approach attractive.[2] We regard *Hulm* as deficient in that it lays down no general principles which can be applied by trial courts.

■ *Durrett* viewed disparity between the foreclosure sales price and the proper-

ty's value as the sole determinative factor. This analysis is unsatisfactory for two reasons. Value is an elusive concept. As has been seen here, experts can differ greatly in their opinion of value. For this reason alone, courts should be loath to rule on the validity of a foreclosure sale based solely upon whether or not the sale achieves a given percentage of value. The elusiveness of value is particularly acute in the context of a foreclosure sale. Some experts, such as one who testified here, believe that a public foreclosure sale at public auction will probably realize a value which is less than fair market value because there is likely to be one bidder at the auction who wants the property much more than other bidders but who will necessarily stop his bidding when the others drop out. Those holding this view call such a value "liquidation value," and assert that it is less than fair market value even if the auction is well-publicized and properly-run. The proponents of this liquidation value concept also contend that a public foreclosure sale will likely be attended largely by individuals who want to purchase for resale at a profit, rather than by consumers who would presumably be willing to pay full "retail" value. *See* R. Jordan and W. Warren, *Bankruptcy* 407–08 (1985). And they point out that the traditional concept of fair market value presumes a sales effort over a sustained period of time during which the seller can wait for the "right" buyer, whereas the sales efforts in public foreclosure usually encompass a shorter period. *Id.* Other challenge the concept of liquidation value, contending that a well-promoted and properly-run public sale encourages the competitive spirit of the bidders and thus will likely net more than will a private sale after the usual broker's commission. We also note that in the present case another value concept, "in place value," was urged upon us as to the equip-

---

**2.** Among the courts implicitly or explicitly adopting *Hulm* in undecided circuits are *Adwar v. Capgro Leasing Corp. (In re Adwar)*, 55 B.R. 111 (Bankr.E.D.N.Y.1985); and *Lower Downtown Assocs. v. Brazosbanc Savings Ass'n*, 52 B.R. 662 (Bankr.D.Colo.1985).

Several courts, however, still find the *Madrid* appellate panel panel approach persuasive. *See*

*In re Winshall Settlor's Trust*, 758 F.2d 1136, 1139 n. 4 (6th Cir.1985); *Bundles v. Baker (In re Bundles)*, 61 B.R. 929 (Bankr.S.D.Ind.1986); *Vernu v. Dorman (In re Verna)*, 58 B.R. 246 (Bankr.C.D.Cal.1986); *In re Ristich*, 57 B.R. 568 (Bankr.N.D.Ill.1986); *In re Upham*, 48 B.R. 695 (Bankr.W.D.N.Y.1985).

ment. We make no attempt to resolve these conflicting views; we suspect that each has validity in particular circumstances. Our point is simply to indicate that the very standard of value is in dispute when we speak of value at public foreclosure, thus making any rule tied only to value all the more difficult to apply.

The *Durrett* rule is also at odds with the Uniform Commercial Code, probably our most modern state law on foreclosure procedure and certainly our most uniform. The U.C.C. requires that every aspect of the sale, whether public or private, be commercially reasonable. U.C.C. § 9–504(3). It contains no requirement that a foreclosure sale achieve a specified percentage of "value." It places emphasis upon the sales efforts made rather than the result achieved. *Id.* Although the foreclosure sales price is certainly relevant in determining whether the sale was commercially reasonable, the fact that a better price could have been achieved by sale through a different method or at another time is not of itself sufficient to establish absence of commercial reasonableness. U.C.C. § 9–507(2). *See Connex Press, Inc. v. International Airmotive, Inc.,* 436 F.Supp. 51, 56–57 (D.D.C.1977) (in ruling against secured party, court emphasized minimal advertising efforts rather than difference between sales price of $325,000 and fair market value of $700,000); *In re Zsa Zsa Limited,* 352 F.Supp. 665 (S.D.N.Y.1972) (court approved public sale which was conducted by an experienced auctioneer after adequate advertising, even though inventory having a wholesale value of $1,750,000 was sold for only $300,000).

█ We do not, on the other hand, adopt the view of the appellate panel in *Madrid* which immunizes from fraudulent transfer attack all non-collusive foreclosure sales so long as they observe the procedural requirements of state law. The 1984 Amendments expressly brought foreclosure sales within the coverage of § 548; they make no distinction between sales that do and sales that do not comply with state law. Congress had the 1982 appellate panel decision in *Madrid* available to it, so that it had

the grist for making such a distinction. We must take the statute at face value as intending to cover all foreclosure sales which fail to bring "reasonably equivalent value."

We disagree, moreover, with the merits of the appellate panel decision in *Madrid. Madrid* and its progeny rely on a three-pronged argument against the application of § 548 to foreclosure sales. First, that fraudulent transfer law is intended to address a debtor's conduct in attempting to defraud his creditors, not to deprive a mortgagee who in good faith follows state procedures and holds a non-collusive sale in order to apply his security to his debt. *E.g., Madrid,* 21 B.R. at 426–27; *see* Zinman, Houle & Weiss, *Fraudulent Transfers According to Alden, Gross and Borowitz: A Tale of Two Circuits,* 39 Bus. Law. 977, 986–94 (1984). Second, that federal courts should not upset foreclosure sales because time-honored, established state procedures provide ample protection to the debtor and other creditors. This argument emphasizes that court supervision of the process (in "judicial foreclosure" states) or a court's power in equity to overturn the sale (in "power of sale" states) ensures that foreclosure sales are not collusive and fair to all parties. *Madrid,* 21 B.R. at 426–27; *see* Zinman, Houle & Weiss, *supra,* at 1003–09. Finally, many courts following *Madrid* wrap themselves in a rather pessimistic policy argument: if federal courts feel compelled to cloud state foreclosure sales with the application of § 548, then bidders at foreclosure sales will disappear, titles to real estate will become uncertain, and the entire foreclosure market will come crashing down, with chilling effects to the lending market and the economy. *E.g., In re Ristich,* 57 B.R. 568, 577 (Bankr.N.D.Ill.1986).

All of these arguments have a common flaw: they assume that state foreclosure procedures are designed to attract bidders and to bring the highest price possible under the circumstances for real property. Quite often the opposite is true. Most state real estate foreclosure laws require little in the way of advertising or other promotional efforts, regardless of whether

or not sales are judicially supervised. *See* Ehrlich, *Avoidance of Foreclosure Sales as Fraudulent Conveyances: Accommodating State and Federal Objectives,* 71 Va.L.Rev. 933, 961–62 (1985).

Massachusetts, a "power of sale" state, is typical in its requirements. A form of legal notice must be published in a local paper "once in each of three successive weeks, the first publication to be not less than twenty-one days before the day of sale...." MASS.GEN.L. ch. 244, § 14. The foreclosing mortgagee is bound to act in good faith and to exercise reasonable dilligence to protect the interests of the mortgagor. In the absence of some special agreement, however, the mortgagee is not required to give any notice of the sale other than the prescribed statutory notice. As a result, sales at low prices attended by only the mortgagee and perhaps one other (who need only bid above the secured debt) usually pass muster. *See Fairhaven Savings Bank v. Callahan,* 391 Mass. 1011, 462 N.E.2d 112 (1984); *Sher v. South Shore National Bank,* 360 Mass. 400, 274 N.E.2d 792 (1971); *West Roxbury Co-op Bank v. Bowser,* 324 Mass. 489, 87 N.E.2d 113 (1949); *DesLauries v. Shea,* 300 Mass. 30, 13 N.E.2d 932 (1938); *Chartrand v. Newton Trust Co.,* 296 Mass. 317, 5 N.E.2d 421 (1936). Although the Supreme Judicial Court of Massachusetts often talks in broad terms about how the mortgagee must act in good faith and proceed as a reasonably prudent man would to obtain a fair price for his own property, the mortgagee is given much leeway. Only a few Massachusetts decisions have invalidated foreclosure sales; these usually involved extreme situations where there was actual bad faith on the part of the mortgagee. *See, e.g., Sandler v. Silk,* 292 Mass. 493, 198 N.E. 749 (1935) (foreclosure sale voided when senior mortgagee was requested by junior lienholder to give notice to her of foreclosure sale and senior mortgagee deliberately failed to do so); *Kavolsky v. Kaufman,* 273 Mass. 418, 173 N.E. 499 (1930) (deficiency denied when mortgagee announced unusual deposit terms at foreclosure sale and unreasonably enforced them, thus forcing a much higher bid to be withdrawn); *Bon v. Graves,* 216 Mass. 440, 103 N.E. 1023 (1914) (mortgagee who had purchased the mortgage for the purpose of foreclosing knew that two neighbors were interested in purchasing portions of the property and yet gave them no notice of the sale); *Clark v. Simmons,* 150 Mass. 357, 23 N.E. 108 (1890) (mortgagee gave ineffective and late notice to the holder of a junior mortgage who had asked to be notified of the sale).

All that the mortgagee need do in Massachusetts, in addition to publishing the statutory notice, is to give notice of the sale to the mortgagor and to others having recorded interests in the property. MASS. GEN.L. ch. 244, § 14. There is no requirement that he publish in the real estate section of the newspaper, as opposed to the section for legal notices. Nor must the published notice be anything more than the technical form of legal notice set forth in the statute, rather than a typical real estate advertisement designed to promote interest in potential buyers. And there is no requirement that the mortgagee take any of the steps that an owner would normally take in selling his own property, such as enlisting the aid of a real estate broker or soliciting interest from parties who would be potential buyers. The Supreme Judicial Court of Massachusetts has been frank in stating: "It is a notorius fact that, when land is sold, by auction, under a power contained in a mortgage, it seldom, if ever, brings a price which reaches its real value." *Austin v. Hatch,* 159 Mass. 198, 199, 34 N.E. 95, 96 (1893), quoted in *Seppela & Aho Construction Co., Inc. v. Petersen,* 373 Mass. 316, 327, 367 N.E.2d 613, 620 (1977). We conclude that the Massachusetts procedural requirements for real estate foreclosure are too minimal to control the question of reasonably equivalent value under § 548 because they are inherently ineffective in producing equivalent value.

■ The § 548 standard of "reasonably equivalent value" implies a rule of reasonableness in light of the particular circumstances. The circumstances under analysis here are of course those of foreclosure. Because the Uniform Commercial Code is

generally regarded as our most enlightened law on the subject, we believe that its broad rule of commercial reasonableness should govern. The value equivalent at foreclosure is too slippery a concept to be expressed only in terms of dollars, whether it be deemed fair market value or a percentage thereof. The determination of whether the price obtained at foreclosure represents the property's reasonably equivalent value must, of course, be made only after due consideration of how the price compares to the property's value as opined by the experts. But it is equally important that the Court give consideration to the nature and extent of the sales efforts in assessing over-all commercial reasonableness. Only then should a decision be made on the question of reasonable equivalence, with both the price and the sales efforts being factors in that decision. The most difficult case would likely involve a sale whose price is a low percentage of value (however value is defined) and yet whose promotional efforts appear to be commercially reasonable. We need not, however, suggest any precise rules, for we are satisfied that the standard of commercial reasonableness is sufficiently flexible for the task.

The standard of commercial reasonableness is broader than the similar rule fashioned by Judge Lavien in *Ruebeck v. Attleboro Savings Bank (In re Ruebeck)*, 55 B.R. 163 (Bankr.D.Mass.1985). *Ruebeck* required, among other things, that the secured creditor obtain a pre-sale appraisal, advertise in the real estate section of a newspaper, and give notice to real estate brokers "within a limited radius of the property." 55 B.R. at 171. Requiring such specific measures has the virtue of greater certainty. We prefer, however, the flexibility which is afforded by the broad concept of commercial reasonableness. And we note that even the more concrete procedure laid down in *Ruebeck* does not purport to

be a precise guideline. For example: under *Ruebeck*, how many times should the secured creditor advertise in the newspaper? What is a "limited radius of the property" for the purpose of the required notice to brokers, and how does one comply with this notice requirement if the property is located within a city containing scores, or hundreds, of brokers? In applying the even more general rule of commercial reasonableness, a court is faced with similar questions, but it will be aided by the large and developing body of law on the subject under the U.C.C. Wherever possible, bankruptcy law should be harmonized with state law. This goal is accomplished by such a rule where the collateral is personal property because sales of such property are already measured by a standard of commercial reasonableness.[3] Where, as here, the collateral includes real estate, the conflict between § 548 and state law on real estate foreclosure sales is too great, so that the principles contained in § 548 must prevail.

We do not believe that a § 548 standard of commercial reasonableness for real estate foreclosure procedures will "chill" local lending and foreclosure markets or impair titles, in light of post-*Ruebeck* developments in Massachusetts and the general familiarity of secured lenders with U.C.C. standards. We understand that the *Ruebeck* decision, rather than "chilling" real estate foreclosures and impairing titles, has merely necessitated the filing of an affidavit by the mortgagee setting forth what actions he has taken in compliance with *Ruebeck*. Upon the recording of such an affidavit, title examiners and title insurance companies make no exception in the title report or insurance coverage concerning the foreclosure. Although federal law prevails here, it does so in a way that provides some measure of certainty and flexibility for foreclosing parties, and ensures that other creditors will have every

---

**3.** We recognize that the U.C.C. expressly permits a secured creditor whose interest is secured by both real and personal property to elect to foreclose on both under state real estate foreclosure law or to proceed separately under the U.C.C. on the personalty. MASS.GEN.L. ch. 106, § 9–501(4). This statute does not presume to require the secured creditor to use U.C.C. procedures to foreclose on the real estate. We do not see our decision today as conflicting with § 9–501(4). Although our disposition here may influence a creditor's election under § 9–501(4), the election will still be available to him and is not affirmatively impaired by our decision.

chance of obtaining at least some of the debtor's equity in the property.

### B. Application of Fraudulent Transfer Principles to This Case

■ We now turn to an application of these principles to the present case, first considering the foreclosure sale of the equipment. The $5,000 foreclosure price is only 25% of the $20,000 "value" which we have found for the equipment. Shea advertised the sale only once, in a weekly paper published in the town of Barre, which is near Rutland where the locus lies. The Court takes judicial notice of the fact that Worcester is the largest commercial and industrial center in the area, having a daily newspaper which has circulation in all cities and towns within Worcester County, including Rutland. Other than this one advertisement, which was in legal form, the only significant effort made by Shea to sell the property was to contact one local company whom he regarded as a potential buyer. He made no attempt to sell the equipment at the same time that he sold the real estate. The plaintiffs' expert, Mr. Berman, has over forty years experience in the selling of equipment of various kinds at public auction. He was of the opinion that the usual method of promoting such a sale would involve advertising in the Worcester morning Telegram or evening Gazette, as well as in the Boston Globe. He further believed that a normal sales effort would include the mailing of about 400 brochures to potential purchasers consisting primarily of end users of similar equipment. The Court concludes, based both upon this testimony and the low price received, that the February 6, 1986 foreclosure sale of the equipment was not a commercially reasonable sale, and that it therefore brought less than reasonably equivalent value. The Court also finds that the Debtor was then insolvent. We therefore rule that the foreclosure sale of equipment constituted a fraudulent transfer under § 548(a)(2).

■ The advertising for the September 18, 1985 real estate foreclosure was confined to the minimal and rather legalistic statutory notice which we have discussed.

Shea's only other promotional activity was to telephone one local broker to notify him of the impending sale. He placed no ads whatsoever in the real estate section of a newspaper, and he made no mailings to potential purchasers or real estate brokers. He did, on the other hand, take what appears to be the advisable measure of obtaining an appraisal of the property, albeit an appraisal which involved little preparatory work on the part of the appraiser.

Application of the rule of commercial reasonableness to these sales efforts on the real estate poses the question of what evidentiary norm should govern. Although the sale came after the decision of the Fifth Circuit in *Durrett* and after enactment of the 1984 Amendments, so that we have no hesitation in applying § 548 to it, the fact remains that Shea's minimal promotional activities were in accord with normal real estate foreclosure procedure at the time, which followed the minimal statutory requirements. (We note that foreclosure procedure in Massachusetts has greatly changed since *Ruebeck*.) We must, therefore, look to Mr. Berman's testimony concerning normal promotional efforts in the sale of the equipment and adapt this by analogy to real estate. The conclusion is obvious. Commercially reasonable efforts in the sale of the Debtor's real estate would have included advertising in the real estate section (not the legal notice section) of the Worcester Telegram or Gazette, as well as mailings to more than one real estate broker. The sales price was only 53% of the amount which we have found to be fair market value. Based upon all of the evidence, we rule that the September 18, 1985 foreclosure was not a commercially reasonable sale, and that it therefore produced less than reasonably equivalent value within the meaning of § 548(a). Because of the Debtor's insolvency, this sale is also voidable as a fraudulent transfer.

### IV. PLAINTIFFS' REMEDY AND SHEA'S LIENS

#### A. Remedy of Reconveyance

■ To the extent a transfer is avoided under § 548, a trustee or debtor in pos-

session may recover for the estate "the property transferred, or, if the court so orders, the value of such property ..." 11 U.S.C. § 550(a). Section 550(a) expresses a congressional intent that a transferee should return the property transferred unless to do so would be inequitable, in which event he must pay the property's value. *Cooper v. Ashley Communications, Inc. (In re Morris Communications NC, Inc.,* 75 B.R. 619, 16 Bankr.Ct.Dec. (CRR) 373, 379 (Bankr.W.D.N.C.1987)); *Armstrong v. Vedaa (In re Vedaa),* 49 B.R. 409, 411 (Bankr.D.N.D.1985). In the circumstances of the present case, it is fairer to all parties that the Court orders the property returned in kind to the Debtor. It would not be equitable to order Shea to pay the difference between the values of the properties as found by the Court and the prices he paid at the foreclosure sales. Although the Court is confident, based upon the evidence before it, that the values as found are accurate, markets are nevertheless unpredictable and appraisal is an inexact science. This consideration outweighs the fact that the Debtor is now operating with other equipment at a different location so that it has little need for this real estate and equipment.

## B. *Lien to Secure Indebtedness*

▮ Even though a transfer is voidable under § 548(a), the transferee who takes for value and in good faith "has a lien on or may retain any interest transferred ... to the extent that such transferee ... gave value to the debtor in exchange for such transfer ..." § 548(c). Shea acted in good faith. And he gave value to the extent of his debt secured by the real estate and equipment. § 548(d)(2)(A).

Only the debt due under the $35,000 note of March 25, 1975 was secured by the real estate and equipment. The mortgage expressly secures just that note. Shea failed to introduce into evidence any security agreement covering the equipment. He did, however, introduce a financing statement listing the equipment as collateral which was duly filed in March of 1975, and a resolution of the Debtor's board of directors stating that the debt was secured

by the Debtor's real estate and equipment. The case was tried by the parties on the theory that Shea had a valid and perfected security interest in the equipment at the time of the February 6, 1986 foreclosure sale. Furthermore, in *In re Numeric Corp.,* 485 F.2d 1328 (1st Cir.1973), the absence of a formal security agreement made no difference when there existed both financing statements and a corporate resolution evidencing an intent to grant a security interest. The same circumstances exist here; we therefore treat Shea as the holder of a perfected security interest in the Debtor's equipment. That security interest can only secure, however, the balance due under the March 31, 1975 note as provided in the corporate resolution, and not the two later smaller notes. We cannot assume the existence of a security agreement clause securing future indebtedness, given the documents before us. We also have in mind that the 1975 debt was originally owed to Bernard, not Shea.

Shea maintains that the debt owed him at foreclosure on the $35,000 note must be calculated in accordance with the parties' agreement of January 10, 1985, except that he concedes the amount appearing in that agreement should have been $35,000 rather than the $36,000 which occasionally appears therein. In a "WHEREAS" clause, the agreement refers to the note as "having a principal balance in the amount of $35,000 with interest to February 1, 1985 in the amount of $1,738.26 for a total of $36,-734.26 (amounts are correct)." In the first paragraph, Shea agreed to postpone foreclosure provided that the Debtor pay him "such total indebtedness in the principal amount of $36,000 together with interest through February 1, 1985, in the amount of $734.26 for a total of $36,734.26, legal expenses in connection with the foreclosure in the amount of $1,500 and constable fees in the amount of $1,000." In the event of the Debtor defaulting in the payments promised under the agreement, the agreement provides that Shea may collect "the full amount of such monies due him pursuant to his notes in the principal amounts of $36,000.00, $5,000.00 and $4,500.00."

The Court declines to use these figures as evidence of the amounts of principal and interest owed. We have previously found, based on undisputed documentary evidence, that Shea paid only $20,882.21 for the 1975 note and mortgage, which was the balance of principal, interest and legal expenses owed at the time of his purchase. This balance reflected payments of principal and simple interest of $25,000 and $10,000, as well as accrued interest and unspecified legal expenses. Other evidence establishes that the principal owed at the time of the 1980 assignment was $18,626.45.[4] The amount of interest stated in the agreement is also incorrect; $1,734.26 in interest on a principal of either $35,000 or $18,626.45 for the time Shea held the debt would amount to a rate of not more than 1% per annum.

The Court suspects that the amounts set forth in the agreement were the product of a mutual error by the parties.[5] Shea introduced into evidence meticulous and contemporaneous records which he kept from the date of the assignment to the date of agreement, revealing the balance of his purchase of $20,882.21 and compound interest of $15,629.37, for a total of $36,511.58 as of January 12, 1985. Shea and the

Debtor apparently arrived at the figures stated in the agreement by erroneously assuming that the face amount of the 1975 note ($35,000) was still owed and then designating the remainder of the total amount owed as interest. We cannot accept the interest figures in either the agreement or Shea's records. The agreement's figure is clearly in error. We furthermore find that Shea, in his records, did not properly calculate the interest on the debt. The 1975 note calls for only simple interest; Shea calculated compound interest. The total amount stated in the agreement, therefore, was as erroneous as the allocation of principal and interest agreed to by the parties. The Court shall disregard the amounts stated in the agreement of January 10, 1985, and look to the other evidence in the case to establish the debt. When calculated according to this evidence, the amount owed to Shea by the Debtor at the time of the foreclosures was $35,632.83.[6]

### C. Lien for Improvements

The real estate is subject to an additional lien in Shea's favor to secure the lesser of: (1) the cost of his improvements to the

---

**4.** In a letter admitted into evidence, Bernard's lawyer stated that the principal balance due as of January 18, 1980 was $18,626.45 following the $10,000 payment received on that date. To this amount $1,266.60 in simple interest to the date of the assignment was added, plus $989.16 in legal expenses, all of which lead to the $20,882.21 paid by Shea on August 12, 1980 for the 1975 note and mortgage.

**5.** The January 1985 agreement may be voidable under the doctrine of mutual mistake. In Massachusetts, a contract is voidable under this doctrine if: (1) the parties share a basic assumption about a fact; (2) the shared assumption of fact relates to an essential element of the parties' agreement; (3) the assumption is mistaken and was capable of ascertainment at the time the parties entered into the contract; and (4) the assumption was not mere expectation or opinion about future events. *E.g., Lefleur v. C.C. Pierce Co.,* 398 Mass. 245, 257–58, 496 N.E.2d 827, 830 (1986); *see Restatement (Second of Contracts* § 152 (1981).

The circumstances surrounding this agreement arguably fulfill these elements. The issue of the agreement's voidability, however, was not central to these proceedings nor was it raised and argued by the parties. The Court therefore makes no ruling as to the agreement's voidabili-

ty, but refuses to accept the amounts stated in the agreement as credible evidence of the amounts of principal and interest actually owed.

**6.** The Debtor made three payments under the January 10, 1985 agreement of $5,028.81 (totalling $15,086.43). These payments were also partial payments on the smaller unsecured notes of $4,500 and $5,000. Because the smaller notes had a total principal balance of about half of the 1975 note, we treat half of these payments, or $7,543.21, as being applicable to accrued interest under the 1975 note.

The 1975 note provides for simple interest at 12% per annum. Interest at 12% on $18,626.45 from January 18, 1980 to September 18, 1985 is $12,665.99. From this accrued interest we deduct interest paid of $7,543.21 and add legal costs (the note and mortgage both having collection costs) of $989.16 incurred prior to the 1980 assignment, plus legal and constable costs incurred by Shea (including the costs for the equipment foreclosure) in connection with the 1975 note (not the others) of $10,894.44. These calculations reveal that the total due on the 1975 note was $35,632.83 as of September 18, 1986. We disregard as *de minimus* any interest accruing between the two foreclosure sales.

property (less profits realized by the transferee from the property); or (2) the increase in value to the property resulting from such improvements. § 550(d)(1). "Improvements" include additions to the property, repairs, payment of taxes, and payment of liens not subject to avoidance by the trustee or junior to the trustee's interest. § 550(d)(2).

Shea has paid $6,952.16 in real estate taxes on the property. Because these taxes were secured by a first lien on the property, their payment should be considered as causing an increase in value equal to the amount paid. Shea also made an improvement as defined by § 550(d)(2) when he repaired the roof of the property, paying $1,146.40. The appraisers who testified in this case agreed that the repair of the roof would result in some increase in the value of the property. We will treat these repairs as causing an increase in value of half the amount paid for the repairs, or $573.20. We find that Shea has derived no "profit" from the property which would offset these increases in value. Although beneficial use could arguably be included with the concept of "profit" in § 550(d), Shea has enjoyed negligible beneficial use of the property.

### V. SUMMARY

We shall issue a separate judgment today requiring Shea to convey the equipment and real estate back to the Debtor. Shea shall have a lien on the real estate and equipment to secure loan indebtedness of $35,632.83; the $18,626.45 principal of this debt shall accrue interest commencing on the date of reconveyance at the 12% simple interest rate of the 1975 note. Shea is also entitled to improvement liens under § 550(d) in the amounts of $6,952.16 and $573.20, secured by the real estate only. No interest shall accrue on these amounts in view of the absence of any expression of intent in § 550(d) or its legislative history to grant interest. All of the foregoing liens shall become effective upon recording of this Court's judgment in the appropriate recording or filing office. All amounts secured by these three liens are presently due. The Debtor, however, is entitled to the protection of the automatic stay under 11 U.S.C. § 362.

A separate judgment shall issue.