In re John R. LINDSAY, et al, Debtors.

John R. LINDSAY, et al., Plaintiffs,

v.

BENEFICIAL REINSURANCE COMPANY, etc., et al., Defendants.

Adv. No. C86–0279–LM11.
Bankruptcy Nos. 86–00478–LM11, 85–03241–LM11, 86–04210–LM11 and 86–04209–LM11.

United States Bankruptcy Court, S.D. California.

April 18, 1989.

Robert L. Rentto, San Diego, Cal., for plaintiffs.

Michael E. Busch, Page, Tucker, Brooks & Busch, San Diego, Cal., for defendants.

## MEMORANDUM DECISION

LOUISE DeCARL MALUGEN, Bankruptcy Judge.

Four related Chapter 11 debtors filed a complaint against Beneficial Reinsurance Company and a related company to set aside a foreclosure sale occurring in Texas in February 1986. The matter came on for trial on July 26, 1988, and continued thereafter on July 27, August 3, 4 and 9, 1988. After trial, the Court took the matter under submission to permit the parties to file supplemental briefs.

The principal theory on which the plaintiffs proceed is that the foreclosure sale should be avoided as a fraudulent conveyance under 11 U.S.C. § 548(a). As such, this is a core proceeding under 28 U.S.C. § 157(b)(2)(H). This Court has jurisdiction to hear the matter pursuant to 28 U.S.C. § 1334 and General Order No. 312–D of the U.S. District Court for the Southern District of California.

Having considered the testimony of the witnesses, examined the evidence offered by the respective parties, considered the written and oral arguments of counsel, including the supplemental briefs, and the case having been submitted to the Court for decision, the Court now makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1. The Court incorporates by reference the extensive admitted facts set forth in Paragraph III of the Pretrial Order entered July 13, 1988, an excerpt of which is attached hereto as Exhibit "A".

2. The plaintiffs were the beneficiaries of a $2.1 million promissory note secured by a wrap-around deed of trust on property owned by Greenway Plaza Investment Company ("Greenway"). Beneficial Reinsurance Company ("Beneficial") was the beneficiary of a $1.4 million promissory note secured by a first deed of trust on the same property.

3. On March 25, 1985, Greenway filed a Chapter 11 petition in the United States Bankruptcy Court for the Northern District of Texas.

4. On or about January 8, 1986, Beneficial obtained relief from the stay to foreclose on the property. The plaintiffs had no notice of this order.

5. On or about January 10, 1986, Beneficial's trustee gave notice of a foreclosure sale to be held on February 4, 1986, to the plaintiffs at their last known address; namely, 3456 Camino del Rio North, Suite 101, San Diego, California 92108. The plaintiffs had moved from that business address and, at the time the notice was sent, maintained a business address of 9225 Mira Mesa Boulevard, Suite 208, San Diego, California.

The plaintiffs did not receive notice of the foreclosure sale.

6. At the foreclosure sale held in Austin, Texas, on February 4, 1986, Beneficial bid $1,592,047.51, which was less than the amount it was owed. Beneficial was the successful bidder at the sale.

7. In late 1985, the plaintiffs retained Mr. Harry Seidman, M.A.I., appraiser, to appraise the Greenway Plaza property in preparation for bringing the plaintiffs' own motion for relief from stay against Green-

way. Mr. Seidman appraised the subject property as of January 3, 1986, one month before the foreclosure sale, at $2.5 million.

8. After commencement of this adversary action, Beneficial retained George Naeter, M.A.I., appraiser, to appraise the subject property. Mr. Naeter appraised Greenway Plaza as of January 28, 1987, at $1.7 million.

9. Both appraisers used three approaches to determining the estimated market value:

a. Using the cost approach, Seidman concluded that the indicated value of the property was $2,775,000. Naeter concluded that the indicated value was $1.7 million. Three main factors accounted for the large discrepancy between the values arrived at by taking this approach:

i. Seidman estimated the reproduction cost at approximately $500,000 more than Naeter.

ii. Naeter estimated incurable physical deterioration at approximately $500,000 more than Seidman.

iii. Naeter deducted $525,000 for "economic obsolesence" which he believed was needed to reflect Austin area vacancy levels of 20–25 percent, which were 15 percent above normal vacancy levels. No such adjustment was made by Seidman, whose appraisal was made before the severe decline in occupancy rates in the Austin market.

b. Using the income approach, Seidman concluded that the value of the subject property was $2,333,000; Naeter concluded it was $1,650,000. The principal reason for the disparity in value in using this approach appears to arise from the different methods used by the appraisers to analyze the value of the future income stream from this property. Using the conventional method, Seidman determined that market rent for this type of unit was $.44/sq. ft., projected the gross income for the property as stabilized, deducted for the estimated lease-up period and capitalized gross rents at 10 percent. Naeter used a discounted cash-flow analysis which he believes is more accurate in an unstable market where vacancy rates are increasing.

c. Using the direct or comparable sales approach, Seidman determined that the indicated value was $3 million; Naeter concluded that it was $1,735,000. The principal difference between the comparable sales analyses by the appraisers appears to be that Naeter did not use Seidman's comparable sales numbers 5, 6 and 7, which were in the same neighborhood as the subject property, although newer.

10. Both appraisers agree that apartment prices started to decline in late 1985 to early 1986. Seidman testified that, historically, the saturation point for apartment absorption in the Austin market was probably reached in the first quarter of 1986, but observed that no one recognized that fact during the first quarter of 1986. Both appraisers agreed that occupancy rates in the Austin rental market had declined since 1986, with the low point having been reached in the first quarter of 1987, about the time of the Naeter appraisal.

Having due regard to the excellent qualifications of both appraisers and the thoroughness of both appraisal reports, the Court gives the greatest weight to the Seidman appraisal as the more accurate reflection of market value at or about the time of the foreclosure. Much of the Naeter analysis appears to have been affected by the rapid decline in the Austin apartment market after the first quarter of 1986. In his income approach, Naeter used a discounted cash-flow analysis appropriate to an unstable market which was not the market condition on the foreclosure sale date. In his cost approach, he deducted for "economic obsolescence", which reflected vacancy levels occurring well after the sale date. These subjective adjustments demonstrate that Naeter was incurably influenced by the dramatic changes in the Austin market conditions which occurred sometime after the first quarter of 1986. The Naeter appraisal, coming almost one year after the foreclosure sale, simply cannot be accorded much weight as an analysis of the property's value on or about February 4, 1986.

11. After foreclosing upon the property, on February 26, 1986, Beneficial received

an offer from Cambio Properties, Inc., to purchase the property for $1,850,000 (Exhibit 33). On March 7, 1986, Cambio increased its offer to $1,875,000, subject to inspection and financing contingencies (Exhibit 34). On March 12, 1986, Beneficial accepted the Cambio offer (Exhibit 55). After numerous extensions of time limits for removal of contingencies, on April 1, 1986, Cambio withdrew from the transaction (Exhibit 43).

12. On or about April 24, 1986, Beneficial received an offer for the Greenway Plaza from Century Pacific Properties, Inc., for a price of $1,950,000 (Exhibit 56). On April 30, 1986, Beneficial made a counter-offer to the Century offer (Exhibit 57), which counter-offer was accepted by Century on May 1, 1986.

Peter Ulrich, who was the president of Beneficial during 1986, testified that he could not recall why the escrow failed.

13. As of the date of trial, Beneficial still retained ownership of the property.

14. After foreclosing on the property, Beneficial expended money to repair it. The sum of $150,000 was spent on roof repair; $200,000 has also been spent on other repairs.

15. Beneficial did not bid the full amount of its indebtedness at the foreclosure sale. Its bid was approximately $100,000–120,000 less than the full amount of the indebtedness, since it did not include all costs, interest and taxes.

## DISCUSSION

This case presents a rather anomalous set of circumstances. California Chapter 11 debtors are challenging the adequacy of a Texas foreclosure by a senior trust deed holder, at which the property was sold for 64 percent of its fair market value. Had this foreclosure sale been challenged in a bankruptcy court in Texas, based on the facts as found by this Court, it is likely that it would have been set aside under the holding of *Durrett v. Washington Nation-*

*al Ins. Co.,* 621 F.2d 201 (5th Cir.1980). *Durrett* and the later opinion of *Abramson v. Lakewood Bank & Trust Co.,* 647 F.2d 547 (5th Cir.1981), *cert. denied,* 454 U.S. 1164, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1982), held that a lien enforcement sale (foreclosure sale or sheriff's sale) for less than reasonably equivalent value could be attacked as a fraudulent transfer under § 67(d) of the former Bankruptcy Act and its successor § 548(a) of the Bankruptcy Code. Most courts have interpreted *Durrett* as standing for the proposition that "reasonably equivalent value" in the lien or execution sale context is present if the sale achieves at least 70 percent of the fair market value and is otherwise non-collusive.

As observed, although this foreclosure sale took place in Texas, the attack on it is being waged in a California bankruptcy court, and the Court must test whether this transaction is avoidable under § 548(a) by the interpretation accorded that section by the Ninth Circuit.[1] This inquiry is made more difficult by what this Court perceives as a lack of clarity in the law of this circuit construing § 548(a).

In order to establish a fraudulent conveyance under § 548(a), the complainant must show that there was (1) a "transfer" of an interest of the debtor (2) within one year from the date of filing of the petition (3) for less than "reasonably equivalent value" and (4) the debtor was insolvent or became insolvent because of the transfer. Here, there is no claim that the debtors were solvent after the foreclosure sale and, indeed, since their ownership interests in the deed of trust were their principal assets, Beneficial could not seriously press this argument.

■ The answer to the more troublesome question of whether a foreclosure sale is a "transfer" within the meaning of § 548(a) has a varied history in this Circuit. Initially, this matter was addressed by the Bankruptcy Appellate Panel (BAP) in the decision of *Madrid v. Lawyers Title Ins.*

1. *Hasbrouck v. Texaco, Inc.,* 663 F.2d 930 (9th Cir.1981); *cert. denied,* 459 U.S. 828, 103 S.Ct. 63, 74 L.Ed.2d 65 (1982).

*Corp. (In re Madrid),* 21 B.R. 424 (9th Cir. BAP 1982). In that decision, the panel side-stepped the question of whether the sale constituted the transfer (although it impliedly assumed the sale was a transfer), and instead focused upon the question of "reasonably equivalent value." Rejecting the *Durrett* analysis, the BAP held that "... the consideration received at a noncollusive and regularly conducted foreclosure sale" withstood avoidance as a fraudulent conveyance. *Madrid,* 21 B.R. at 427.

When appealed to the Ninth Circuit Court of Appeals, the court affirmed the BAP's decision on different grounds; namely, that the foreclosure sale was not the date of transfer at all. *In re Madrid,* 725 F.2d 1197 (9th Cir.1984). Rather, the court determined that the transfer for § 548(a) purposes occurred when the lender's security interest in the debtor's property was perfected and, since the deed of trust was recorded more than one year prior to the filing of the bankruptcy petition, the transfer was not subject to attack.

Unfortunately, this rationale overlooks the fact that when a security agreement is enforced (i.e., by a foreclosure), a second transfer occurs of the debtor's equity interest in the property over and above that which is necessary to satisfy the secured debt. It is this transfer, which usually occurs later than the security transfer and may be involuntary, that is being challenged as fraudulent.[2] Judge Farris' concurring opinion in *Madrid* recognized the flaw in the majority's reasoning that there is only one transfer, stating:

**2.** See Kennedy, *Involuntary Fraudulent Transfers,* 9 Cardozo L.Rev. 531, 554–49 (1987); Alden, Gross and Borowitz, *Real Property Foreclosure As A Fraudulent Conveyance: Proposals For Solving The Durrett Problem,* 38 Bus.Law. 1605, 1608–13 (1983).

**3.** Section 101(50) now reads in its entirety: "Transfer" means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption.

As I understand the majority's rationale, such subsequent transfers would not be covered even if effected with actual intent to defraud. Section 548(d)(1), relied upon by the majority, does not support the "one transfer" rule. That section addresses the problem of secret transfers by refusing to recognize transfers that are not sufficiently open to be valid against bona fide purchasers. 725 F.2d at 1204.

When the BAFJA amendments were drafted in 1984, there was an attempt by Congress to resolve the *Madrid/Durrett* schism. In his excellent summary in the case of *In re Verna,* 58 B.R. 246 (Bankr.C. D.Cal.1986), Judge Bufford describes the changes that were proposed, the controversy generated by them, the amendments enacted and the attempts after enactment to "create" legislative history. *Id.* at 250–51. The legislative flurry resulting in the BAFJA amendments did make two critical changes to the Bankruptcy Code. First, § 101(40), which is now § 101(50), was amended to define a "transfer" as the "foreclosure of the debtor's equity of redemption."[3] The effect is to statutorily recognize that while the granting of a security interest may be one transfer, a second transfer occurs upon foreclosure of the debtor's equity interest. Second, § 548(a) was broadened to give a trustee the power to avoid a transfer if the debtor "voluntarily or involuntarily" made the transfer.

Since the enactment of the BAFJA amendments, the Ninth Circuit Court of Appeals has not had an opportunity to address the effect of these amendments on post-BAFJA foreclosure sales.[4] The bank-

The phrase "and foreclosure of the debtor's equity of redemption" was added by BAFJA in 1984.

**4.** In the recent decision of *In re Ehring,* 91 B.R. 897 (9th Cir. BAP 1988), the BAP obliquely addressed the state of Ninth Circuit law post-BAFJA in a case in which a foreclosure sale was attacked as a preference under § 547. Although they held that the foreclosure sale was not a preference, the Panel could not agree whether the Ninth Circuit Madrid rule had been changed by the BAFJA amendments.

ruptcy court in *Verna, supra,* was the first to do so in California. In addressing the question of whether a foreclosure sale constituted a transfer, Judge Bufford agreed with the holding in *In re Christian,* 48 B.R. 833 (D.Colo.1985), observing:

> The court found, under Colorado law, that the foreclosure sale only transferred a lien interest to the purchaser, which did not ripen into an ownership interest until after the redemption period expired. The court held that the change in rights arising from the foreclosure sale resulted in the transfer of an interest in the property. The *Christian* court is thus in agreement with this Court's analysis. 58 B.R. at 251.

This Court agrees with the *Christian* and *Verna* holdings that a foreclosure sale is a transfer for § 548(a) purposes. The amendment to § 101(50) now makes clear that a transfer occurs when the debtor loses its equity interest in a property. For § 548(d)(1) purposes, that occurs when the foreclosure is conducted. *Butler v. Lomas and Nettleton,* 862 F.2d 1015, 18 BCD 1039 (3d Cir.1988); *see also,* Alden, Gross & Borowitz, *supra* note 2, at 1610–11.

■ In addressing whether the debtor received reasonably equivalent value at the foreclosure, the *Verna* court was likewise unsure of the state of the Ninth Circuit law. Judge Bufford stated:

> In overruling the Ninth Circuit's *Madrid* decision, Congress did not reinstate the Ninth Circuit Bankruptcy Appellate Panel's *Madrid* decision, which held that a regularly conducted and noncollusive foreclosure sale establishes the reasonably equivalent value of the property. *Id.* at 251–52.

Nevertheless, he adopted the reasoning of the majority in the BAP *Madrid* decision, holding that:

> Where a third party purchases property at a non-collusive and regularly conducted foreclosure sale, the sale establishes the reasonably equivalent value as required by Bankruptcy Code Section 548. *Id.* at 252.

It is against this backdrop that this Court examines what rule should be applied in determining whether a foreclosure sale may be avoided as a fraudulent conveyance under § 548(a).

In reviewing the decisions of the progeny of *Durrett* and *Madrid,* it appears that some of the courts are engaging in policy debates over the purpose of Bankruptcy Code § 548. Those aligned with the BAP majority in *Madrid* seem to focus on the original intention of the law of fraudulent conveyances as reflected by the Statute of 13 Elizabeth enacted in 1570. That purpose was stated to be for "Avoiding and Abolishing ... Conveyances ... Judgments and Executions as well of Lands and Tenements as of Goods and Chattels, ... devised and contrived ... to the End and Purpose and Intent, to delay, hinder or defraud Creditors." 13 Eliz., chapt. 5, sec. I (1570) as quoted in Kennedy, *supra* note 2, at 536–7 (1987). When early fraudulent conveyance cases forced courts to wrestle with difficulty of proving a debtor's subjective intent to defraud, courts devised "badges of fraud"—circumstances or conduct from which a court might find constructive fraud without regard to intent. Despite the adoption of the concept of constructive fraud by American bankruptcy law and the predecessors to § 548(a),[5] these anti-*Durrett* courts agree with the conclusion that:

> Non-collusive, regularly conducted foreclosure sales, non-fraudulent by definition, were not within the "mischief" for which the statute was written, and thus, until *Durrett,* courts did not apply fraudulent conveyance law to these sales. Zinman, *NonCollusive, Regularly Conducted Foreclosure Sales: Involuntary NonFraudulent Transfers,* 9 Cardozo L.Rev. 581, 584 (1987).

*See, also, In re Bundles,* 61 B.R. 929, 935 (Bankr.S.D.Ind.1986); *In re Winshall Settlor's Trust,* 758 F.2d 1136 (6th Cir.1985).

On the other hand, those courts which agree with *Durrett* have been troubled by state court foreclosure procedures which frequently result in the loss to other credi-

---

**5.** Kennedy, *supra,* at 537, 553.

tors of a substantial amount of debtor's equity.[6] They view § 548's purpose as ensuring a fair return on the debtor's assets for the benefit of all creditors:

> All of these arguments [in favor of a irrebuttable presumption for non-collusive foreclosure sales] have a common flaw: They assume that state foreclosure procedures are designed to attract bidders and bring the highest price possible under the circumstances for real property. Quite often the opposite is true. Most state real estate foreclosure laws require little in the way of advertising or other promotional efforts regardless of whether or not sales are judicially supervised. *In re General Ind.*, 79 B.R. 124, 131–32 (Bankr.D.Mass.1987).

*See, also, In re Pruitt*, 72 B.R. 436, 446 (Bankr.E.D.N.Y.1987).

Implicitly, these courts recognize, as observed by Professor Frank Kennedy, that the injury to unsecured creditors, when the purchaser at a foreclosure sale pays an inadequate price, is no less than when the debtor participates in the fraud:

> It is difficult to take seriously an argument that a foreclosure which sacrifices a valuable equity of an insolvent debtor's property should be voidable by creditors when debtor is compliant or cooperative, but that such a sale should be invulnerable to attack by creditors when the debtor either simply defaults or is resistant but unable to forestall the loss. The injury to creditors resulting from a forfeiture of an asset having significant value is equally palpable and ought to be equally remediable in any rational system without to the debtor's mental state.... Kennedy, *supra* note 2, at 576.

Although pondering the philosophical underpinnings of § 548 is an interesting intellectual exercise, this Court is constrained to observe that any analysis of the statute must begin with the clear language of that statute. Section 548(a) provides that a transfer of the debtor's property may be set aside if it is made for less than reasonably equivalent value. The provision makes no distinction between sales that do or do not comply with state law. Although it does appear that the exemption for non-collusive, regularly conducted foreclosure sales was an attempt to "harmonize" foreclosure law with fraudulent conveyance law, compliance with the state standard should not determine the outcome where Congress has established a federal standard which would permit avoidance as constructive fraud where an inadequate price was realized.[7]

---

**6.** *See, also* Lo Pucki, *A General Theory of the Dynamics of the State Remedies/Bankruptcy System*, 1982 Wis.L.Rev. 311, 316–21; and, Wechsler, *Through The Looking Glass: Foreclosure By Sale As De Facto Strict Foreclosure— An Empirical Study of Mortgage Foreclosure And Subsequent Resale*, 70 Cornell L.Rev. 850, 870–1 (1985), for studies of the inefficiencies of state foreclosure procedures and comparison with bankruptcy court sales procedures.

**7.** We are also aware that courts rejecting application of a federal standard to regularly conducted foreclosure sales under § 548(a)(2) did so out of grave concern over the economic effect of adopting an independent standard of review. [see *In re Madrid*, 725 F.2d 1197, 1202: "Negative repercussions would also be likely in the lending arena, where creditors would be less willing to lend funds on the security of a mortgage or deed of trust."; *Abramson v. Lakewood Bank & Trust Co.*, 647 F.2d 547, 550, Clark, J., dissenting: "The cloud created over mortgages and trust deeds by making foreclosure sales subject to being avoided by a bankruptcy trustee will naturally inhibit a purchaser other than a mortgagee from buying at foreclosure. This tends to depress further the prices of foreclosure sales...."; *In re Verna*, 58 B.R. 246, 252: "A contrary rule would put a cloud on the title of any property subject to a foreclosure sale ... Such a cloud would seriously impair the marketability of foreclosed property."]

However, at least one commentator suggests that these fears are not supported by hard statistical data. The conclusion of this commentator is that, "... the available aggregated statistical data on interest rates, loan-to-price ratios, and total loans created before and after these decisions show that *Durrett* and *Madrid* made little, if any, apparent difference either way in those variables." Shuchman, *Data on the Durrett Controversy*, 9 Cardozo L.Rev. 605, 616 (1987). Commenting on similar doomsday warnings expressed after the decision in *In re Ruebeck*, 55 B.R. 163 (Bankr.D.Mass.1985), which mandated, among other things, a pre-sale appraisal, public advertisement and notice to real estate brokers, two years after the decision, Judge Queenan in the *In re General Industries, Inc.*, case observed:

> We understand that the *Ruebeck* decision, rather than "chilling" real estate foreclosures and impairing titles, has merely necessitated

Judge Volinn, in his dissent to the BAP *Madrid* decision, concluded that no exemption should be extended to regularly conducted non-collusive foreclosure sales because:

Section 548 transcends the dispute between this debtor and the secured creditor. It brings into focus the claims of the debtor's other creditors that they have been deprived of recourse to an asset by an improvident sale. The majority would hold that despite widespread differences in law and practices related to foreclosure, no bankruptcy court may entertain the factual issue of whether, under § 548, the consideration paid was the reasonably equivalent value. By concluding that a regularly conducted sale in the absence of collusion satisfies the "reasonably equivalent value" test, the majority has excised vital language from § 548 in order to create an exception to the statute where a forced sale of debtor's property is involved. There is nothing in the Code nor its legislative history to suggest that such an exception was intended. 21 B.R. at 428.

The Seventh Circuit Court of Appeals in *Bundles v. Baker (In re Bundles)*, 856 F.2d 815 (7th Cir.1988) endorsed Judge Volinn's position, stating:

Implying an irrebuttable presumption would be inconsistent with that language. Such a reading, in effect, creates an exception to the trustee's avoiding powers under § 548(a)(2)(A)—an exception not otherwise found in the statute— for property sold at a foreclosure sale [citations omitted].... Moreover, an irrebuttable presumption has the effect of reading good faith into section 548(a)(2)(A); as long as the sale is conducted in good faith and in accordance with state law, the sale priced is conclusively presumed to be a reasonably equivalent value. This result is incon-

sistent with section 548(a)(2)'s purpose of permitting the trustee to avoid transfers as constructively fraudulent, irrespective of the parties' intent. [citations omitted] Finally, an irrebuttable presumption renders section 548(a)(2) merely duplicative of other Code provisions, such as section 548(a)(1) (permitting avoidance for actual intent to defraud) and section 544(b) (permitting avoidance where state law would allow it.... We therefore conclude that section 548(a)(2)(A) establishes a federal basis—independent of state law—for setting aside a foreclosure sale. *Id.* at 823.

While we realize that some courts have pointed to the fact that during the 1984 amendment process Congress had under consideration a provision which would have exempted regularly conducted, non-collusive foreclosure sales (See *Verna, supra,* at 50), this provision was not enacted. Nothing more can be or should be read into the clear statutory language where Congress has not acted.

In arriving at a federal definition of "reasonably equivalent value", this Court is struck with the elusiveness of the entire concept of value. *See Bundles, supra,* at 823, 824. Judge Queenan, in the *General Industries* case, attempted to solve the dilemma by instead adopting a standard of "commercial reasonableness":

The value equivalent at foreclosure is too slippery a concept to be expressed only in terms of dollars, whether it be deemed fair market value or a percentage thereof. The determination of whether the price obtained at foreclosure represents the property's reasonably equivalent value must, of course, be made only after due consideration of how the price compares to the property's value as opined by the experts. But it is equally important that the Court give consideration to the nature and extent of the sales efforts

the filing of an affidavit by the mortgagee setting forth what actions he has taken in compliance with *Ruebeck.* Upon the recording of such an affidavit, title examiners and title insurance companies make no exception in the title report or insurance coverage concerning the foreclosure. 79 B.R. 124, 133 (Bankr.D.Mass.1987).

Regardless of the merits of the concerns, we agree with those courts who believe that economic policy concerns are best resolved by Congress. *Hulm v. First Federal S & L Assn.,* 738 F.2d 323, 327 (8th Cir.1984), *cert. denied* 469 U.S. 990, 105 S.Ct. 398, 83 L.Ed.2d 331 (1984); *Bundles v. Baker,* 856 F.2d 815 (7th Cir.1988).

in assessing overall commercial reasonableness. Only then should a decision be made on the question of reasonable equivalence, with both price and the sales efforts being factors in that decision. 79 B.R. at 124.

Judge Volinn, in his *Madrid* dissent, recommended that the price paid at a regularly conducted foreclosure sale should be given a strong presumption of adequacy since, "One cannot disregard the fact that a foreclosure sale is a forced sale...." 21 B.R. at 428.

Most recently, the Seventh Circuit Court of Appeals in *Bundles*, adopted a hybrid test recommending that although it would be appropriate to extend a rebuttable presumption to the price obtained at the foreclosure sale, the bankruptcy court should examine the foreclosure transaction in its totality, "... to determine whether the procedures employed were calculated not only to secure for the mortgagee the value of its interest, but also to return to the debtor-mortgagor his equity in the property." *Bundles, supra,* at 824.

■ This Court concludes that the most balanced approach is one which will leave undisturbed the result of foreclosure sales that are procedurally proper, non-collusive and conducted in a commercially reasonable manner. To achieve that result, the court should conduct the following inquiry: First, the court should determine whether the foreclosure sale was properly conducted in accordance with state law and was non-collusive.

Second, the court should examine the totality of circumstances surrounding the sale to determine whether commercially reasonable steps were taken to achieve the best price at the foreclosure. If the Court is satisfied with the answer to the second inquiry, no further examination of the sale need be made. There is no question that situations may occur in which a low percentage of fair market value is achieved even after employing sales efforts which are commercially reasonable for a forced sale. However, in those circumstances, this Court would leave the sales undisturbed. On the other hand, if the Court finds that the foreclosing creditor failed to take commercially reasonable steps to achieve the best forced sale price, the Court may then look to evidence of the effect of that failure on the price achieved. This third inquiry will necessarily require a consideration of evidence of the property's value, including its fair market value as determined by experts, or other evidence (such as resales).

■ In utilizing this three-part inquiry, the Court is not elevating compliance with state court foreclosure standards above all other factors. Neither is the Court looking solely to percentage of fair market value achieved. Rather, the Court will examine the price obtained at a foreclosure sale only when we are persuaded that the foreclosing creditor failed to take commercially reasonable efforts to achieve the best price.

## CONCLUSIONS OF LAW

■ In making the first inquiry in this case—that is, whether the foreclosure sale was regularly conducted and non-collusive —this Court concludes that the foreclosure sale complied with Texas law despite the fact that debtors did not receive notice. Texas Property Code § 51.002 required only that notice of sale be given 21 days before the date of sale by posting the notice on the courthouse door, filing a copy of the notice in the office of the county clerk and serving the written notice of sale by certified mail on the debtors at the address shown by the records of the holder of the debt.

In granting Beneficial's FRCP 41(b) motion for judgment on the issue of notice, this Court found that although the trustee under the deed of trust had the debtors' correct address, Texas law does not impute that knowledge to the debt holder, Beneficial.[8] Therefore, even though debtors in this case did not receive notice of the fore-

---

**8.** *Dillard v. Broyles,* 633 S.W.2d 636 (Tex.Ct.App. 1982); *cert. denied,* 463 U.S. 1208, 103 S.Ct. 3539, 77 L.Ed.2d 1389 (1983).

closure sale, because it was mailed to their old address, notice was given in compliance with the Texas statute. As one Texas court has opined, "The general purpose of the statute is to provide only a minimum level of protection for the debtor, and it provides for only constructive notice of the foreclosure." *Krueger v. Swann,* 604 S.W. 2d 454, 457 (Tex.Ct.App.1980).

Additionally, in completing the first stage of inquiry, the Court concludes there was no evidence of collusion.

The second stage of the inquiry is whether Beneficial undertook any effort to insure realization of the best price at the foreclosure sale. The Court concludes it did not. There is no evidence that Beneficial made any effort to achieve the best price at the sale. For instance, Beneficial did not appraise the property, advertise it widely or encourage competitive bidding before the sale.

In the absence of any evidence of commercially reasonable sales efforts, the Court must now inquire whether there is any evidence that Beneficial's failure to undertake such efforts impacted the sale price obtained. First, we start with the $2.5 million fair market value suggested by the Seidman appraisal. The foreclosure sale to Beneficial was for $1,592,047, or roughly 64 percent of the estimated fair market value. Further, the testimony of Beneficial's own witness, suggests that a better price could have been obtained at the foreclosure sale. Mr. Ulrich testified to the effect that the so-called "bottom fishers" offered $1,875,000 and $1,950,000 for the property shortly after the foreclosure sale.

The Court is aware that there is some debate whether fair market value is likely to be achieved at a well-publicized properly run foreclosure sale.[9] However, where there is substantial disparity between the fair market value and the foreclosure price, independent evidence that a better price could have been obtained and failure to take any commercially reasonable steps to realize the best price, the Court must find the debtors did not receive a reasonably equivalent value at the sale.

■ Having determined that the foreclosure sale should be avoided as a fraudulent conveyance, the Court must now establish an appropriate remedy. When a foreclosure sale is avoided as a fraudulent conveyance, the court may either rescind the transaction entirely, requiring the debtor to repay the lender the full amount of its price in exchange for return of the property; or, require the purchaser to return the property to the debtor or its value in exchange for a lien in the amount of the purchase price. *In re General Industries,* 79 B.R. at 134–35. Alden, Gross & Borowitz, *supra* note 2, at 1618.

■ In this case, the court is not faced with the uncomfortable situation of having to fashion a remedy involving a third party purchaser, since Beneficial still retains ownership. However, it must be remembered that these debtors were themselves lenders to Greenway, and were the owners of only a $2.1 million promissory note secured by a wrap-around deed of trust on the property.

Restoration of these parties to their respective positions at the time of the foreclosure sale is simply not possible. As both appraisers testified, sometime after the foreclosure sale occurred, the Austin apartment market precipitously declined. Neither the debtors nor Beneficial contends that the market has now recovered. As between the debtors and Beneficial, the burden of that loss must be allocated to the wrongdoer, Beneficial. However, return of the property or its equivalent value to the debtors (which the debtors are urging) does not require return of an asset valued at $2.5 million. Rather, at best, plaintiffs are entitled to recovery of the value of their promissory note, with deductions for the full amount of the Beneficial claim on the date of the foreclosure sale.

Accordingly, this Court finds that the debtors are entitled to a judgment in the amount of the difference between the balance due on their $2.1 million promissory

9. See discussion in *In re General Industries, supra,* at 130–31.

note secured by a deed of trust and the amount of Beneficial's debt at the time of the sale. Although Beneficial bid only $1,592,047 at the foreclosure sale, Mr. Ulrich testified that approximately $120,000 in costs, interest and taxes advanced pre-sale was not included in the bid. This Court will make an additional deduction from the judgment in favor of the debtors for the actual amount of Beneficial's debt on the date of foreclosure. Beneficial may establish this by declaration, which may be challenged by the debtors at a supplementary hearing, if the debtors disagree with the calculations.

The Court will make no adjustment for the cost of repairs or improvements made by Beneficial or property taxes paid post-sale, since Beneficial has retained the use of the property, collected its income and had its "enjoyment" since the foreclosure sale date.

This Memorandum Decision constitutes findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052. Counsel for the debtors is directed to prepare an order in conformance with this Memorandum Decision within ten (10) days from the date of entry hereof.

### EXHIBIT "A"

Excerpt From Pretrial Order Entered July 13, 1988

The following facts are admitted and require no proof:

1. Plaintiff John R. Lindsay ("Lindsay") is, and at all relevant times was, an individual and resident of San Diego County, California.

2. Plaintiff Lindsay Enterprises, Inc. ("LEI") is, and at all relevant times was, a corporation organized and existing under the laws of the State of California, with its principal office in San Diego County.

3. Plaintiff IMA 79-6 is, and at all relevant times was, a limited partnership organized and existing under the laws of the State of California, with its principal office in San Diego County.

4. Plaintiff IMA 81-3 is, and at all relevant times was, a limited partnership orga-nized and existing under the laws of the State of California, with its principal office in San Diego County. (IMA 81-3 and IMA 79-6 are referred to collectively as "the IMAS").

5. LEI did not have a recorded interest in title of ownership in the subject property.

6. Defendant Beneficial Reinsurance Company was a corporation organized and existing under the laws of the State of California with, Plaintiffs contend its principal office in Los Angeles County, [sic] which was merged into Beneficial Standard Life Insurance Company on or about December 31, 1985, and dissolved.

7. Defendant Beneficial Standard Life Insurance Company is, and at all relevant times was, a corporation organized and existing under the laws of the State of California, with its principal office in Los Angeles County. Beneficial Standard Life Insurance Company is the successor in Beneficial Reinsurance Company's interest in the property at issue.

8. Lindsay filed a voluntary Chapter 11 petition with this Court on January 29, 1986.

9. LEI filed a voluntary Chapter 11 petition with this Court on July 12, 1985.

10. IMA 79-6 and 81-3 filed voluntary Chapter 11 petitions with this Court on July 2, 1986.

11. On or about October 27, 1982, the IMA's owned real property in Austin, Texas, commonly identified herein as The Greenway Plaza Apartments, and more particularly described as:

> Tract B, First Resubdivision of Greenway Plaza Southeast, a subdivision in Travis County, Texas, according to the map or Plat of record in Volume 64, Page 83, Plat Records of Travis County, Texas.

Beneficial Reinsurance Company held a promissory note made by the IMA's in the principal amount of $1,400,000, which was secured by a first priority trust deed encumbering the Greenway Plaza Apartments, and which was guaranteed by Lindsay.

12. On or about October 29, 1982, the IMA's sold the Greenway Plaza Apartments to Greenway Plaza Investment Co., a Texas partnership, and took back as part of the purchase price therefor, an all-inclusive promissory note in the principal amount of $2,100,000, which included said obligation to Beneficial and which was secured by al all-inclusive trust deed (referred to as the "wraparound note and trust deed"). Said wraparound note and trust deed were junior to but wrapped around and included the $1,400,000 promissory note and trust deed executed by the IMA's and payable to Beneficial Reinsurance Company, and which were subsequently assigned to Beneficial Standard Life Insurance Company. There were no other trust deeds on The Greenway Plaza Apartments.

13. On or about March 25, 1985, Greenway Plaza Investment Co., filed a voluntary petition under Chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the Northern District of Texas.

14. Beneficial asserted a claim against said debtor in the approximate amount of $1,400,000, secured by said first trust deed. On or about May 7, 1985, Beneficial, through Jenkens & Gilchrist, its attorneys, filed a Motion to Modify Stay, to Appoint an Examiner and Opposition to Debtors Post–Petition Use of Cash Collateral for stay relief in said bankruptcy case.

15. Plaintiffs asserted a claim against said debtor in the amount of the difference between the approximate amount of $2,100,000, secured by the wraparound trust deed less Beneficial's claim. On or about June 6, 1985, plaintiffs, through the Decker, Hardt firm, its attorneys, sent a letter to Beneficial through Jenkens & Gilchrist, a true copy of which has been marked as Exhibit "9".

16. On or about June 11, 1985, Beneficial, through Jenkens & Gilchrist, sent a letter to plaintiffs through the Decker, Hardt firm, a true copy of which has been marked as Exhibit "10".

17. On or about July 15, 1985, Beneficial, through Jenkens & Gilchrist, gave notice of foreclosure on a different property than Greenway Plaza, for which property different IMA partnerships were junior lienholders to Beneficial. That notice was sent to those partnerships as follows: IMA 79–8, IMA 78–1, IMA 77–4, and IMA 76–2 c/o John R. Lindsay, 9225 Mira Mesa Blvd., Ste. 208, P.O. Box 261249, San Diego, California 92126, a true copy of which has been marked as Exhibit "11".

18. On or about July 15, 1985, said IMA's through the Decker, Hardt firm, filed their motion for relief from stay in said bankruptcy proceeding.

19. On or about January 8, 1986, an order granting Beneficial stay relief to foreclose on The Greenway Plaza Apartments was obtained by Beneficial, through Jenkens & Gilchrist, and entered in said Texas Bankruptcy Court. Neither Beneficial nor anyone else sent a copy of that order to plaintiffs or their attorneys.

20. On or about January 10, 1986, Beneficial, through Jenkens & Gilchrist, mailed copies of notice of a foreclosure sale of The Greenway Plaza Apartments to the IMA's. Said notice was sent by certified mail to the IMA's at 3456 Camino del Rio North, Suite 101, San Diego, California 92108, at least 21 days before the date of the sale.

21. On or about January 13, 1986, Beneficial, through Jenkens & Gilchrist, mailed copies of notice of said foreclosure sale to Lindsay.

22. On or about February 4, 1986, Beneficial, through Jenkens & Gilchrist, the substitute trustee under the deed of trust conducted a foreclosure sale of The Greenway Plaza Apartments, at which sale Beneficial was the successful bidder and purchased The Greenway Plaza Apartments for a credit bid of $1,592,047.51. Plaintiffs contend in their Third Cause of Action for declaratory relief that there was a defect in the sale in that they allege there was not proper or adequate notice of the sale and the sale was therefore invalid.

23. Plaintiffs filed their adversary complaint on April 18, 1986. This complaint was not served on defendants.

24. Plaintiffs filed an amended complaint on September 29, 1986. This com-

plaint was served on defendants on September 29, 1986.

25. On or about February 11, 1986, plaintiffs, through the Decker, Hardt firm, sought to set aside said sale through an Emergency Motion to Set Aside Order Terminating Stay and Setting Aside Foreclosure Sale filed in the Texas Bankruptcy Court. Said court denied said motion because it found that it did not have jurisdiction over either the Greenway Plaza Apartments or the dispute between Beneficial and plaintiffs.

26. On or about February 1986, Beneficial took possession of The Greenway Plaza Apartments. Beneficial received various offers to buy said property. No sale closed and Beneficial remains in possession of said property.

27. The Greenway Plaza Apartments were in a poor state of repair and maintenance when Beneficial took possession thereof.

28. All of the payments received by Beneficial were from The Greenway Plaza Investment Co.

29. The following subparagraphs a through j are verbatim recitation of findings from the Amended Order Granting In Part Defendants' Motion for Summary Adjudication of the issues and Judgment thereon entered June 22, 1988:

a. The stay in the LEI and Lindsay cases did not apply to the property;

b. The IMA's did not file their Chapter 11 cases until after the foreclosure sale in Texas;

c. The filing of a Disclosure Statement and a Consolidated Plan of Reorganization dated May 5, 1986, for Lindsay Enterprises, Inc., and the subsequent confirmation of that Plan did not occur until after the foreclosure sale;

d. Plaintiffs allege a contract by Beneficial not to conduct a foreclosure sale or not to take any action before giving notice to plaintiffs;

e. There was not contract for the alleged agreements between plaintiff's Texas counsel and defendants' Texas counsel. Defendants' Texas counsel was asked to send a courtesy copy of the Agreed Order entered in The Greenway Plaza Investment Company bankruptcy;

f. There was no contract to not take any other action;

g. There was no reasonable reliance on the alleged promises by defendants' Texas counsel in this case to send a courtesy copy of the Agreed Order entered in The Greenway Plaza Investment Company bankruptcy or on the other promises allegedly made by defendants' Texas counsel;

h. The file in The Greenway Plaza Investment Company were public records in the Bankruptcy Court for the Northern District of Texas. Under the Bankruptcy Rules, plaintiffs, by Munsch, could have requested special notice. There was no evidence that plaintiffs or Munsch did any of the foregoing. Any purported reliance by plaintiffs on the actions or promises of Beneficial or its agents was unreasonable;

i. There is no evidence of an intentional or negligent concealment by Beneficial from plaintiffs or their Texas counsel;

j. There was no reasonable reliance by plaintiffs or their Texas counsel on the allegedly concealed facts.