In re David Eugene GANTZ, Debtor.

David Eugene GANTZ, Appellant,

v.

COLONIAL CENTRAL SAVINGS BANK, F.S.B.; Michael W. Guber; Judy L. Guber; Joseph A. Frates, Jr.; Barbara J. Hughes; and Keycorp Mortgage, Inc., Appellees.

No. 93–CV–0262–B.

United States District Court, D. Wyoming.

Jan. 13, 1994.

892

Georg Jensen, Cheyenne, WY, for debtor/appellant.

Bruce N. Willoughby, Casper, WY, for Colonial Cent. Sav. Bank.

Don W. Riske, Cheyenne, WY, for Michael W. and Judy L. Guber.

Peter J. McNiff, Cheyenne, WY, for Frates, Hughes and Keycorp.

### ORDER AFFIRMING THE BANKRUPTCY COURT'S GRANT OF SUMMARY JUDGMENT FOR APPELLEES AND DISMISSING THE ADVERSARY PROCEEDING

BRIMMER, District Judge.

The above-entitled matter having come before this Court on Appellant's Appeal from the Order of the Bankruptcy Court Granting Appellees' Motion for Summary Judgment and Dismissing the Adversary Proceeding, and the Appellees' Oppositions, and the Court, having read the materials on file both in support of and in opposition thereto, having heard oral argument from the parties, and being fully advised in the premises, hereby FINDS and ORDERS as follows:

### Factual Background

This case presents an interesting question of law, one of first impression within this circuit, on the issue of defining what constitutes "reasonably equivalent value" when a debtor seeks to set aside the sale of his personal residence after a public foreclosure sale pursuant to 11 U.S.C. § 548(a)(2)(A) (1988).

The essential facts in this case are not disputed. Appellant and his second wife[1] jointly purchased a home in Cheyenne, Wyoming and executed a promissory note and a mortgage to Superior Mortgage Company ("Superior") in the amount of $75,350. Superior subsequently assigned its rights to the mortgage payments to appellee Colonial Savings Bank, F.S.B. ("Colonial"). Appellant and his second wife were later divorced, and pursuant to the terms of the divorce decree, appellant obtained the entire interest in the property.

Appellant subsequently became delinquent in his monthly mortgage payments to Colonial, and as a result, Colonial instituted foreclosure proceedings on March 10, 1992. Colonial purchased the property at the sale for $60,744 and received a sheriff's deed to the property. Appellant acknowledges that the foreclosure was conducted in accordance with the relevant Wyoming statutes,[2] that all necessary procedures were followed and that the price paid for the property by Colonial was computed in reliance on the guidelines and price regulations of the United States Department of Housing and Urban Development.

On March 20, 1992, ten days after the foreclosure sale, appellee Michael Guber ("Guber"), a self-proclaimed entrepreneur, ordered a title commitment on the property. Over the next few days, Guber listed the property for sale and began marketing it. The parties do not dispute that Guber's actions in listing this property, in which he presently had no interest, were undertaken prior to the expiration of plaintiff's statutorily defined redemption period.[3]

---

1. The appellant had been married to another woman, but they were divorced some years before his second marriage.

2. *See* Wyo.Stat. § 1–18–101 et seq. (1988).

3. Wyo.Stat. § 1–18–103(a) (1988) provides that a party whose property is sold by way of, *inter alia,* a foreclosure sale, may redeem the property within three (3) months of the sale date by pay-

On April 11, 1992, approximately one month into appellant's redemption period, Guber entered into a contract with appellees Hughes and Frates for the sale of this property for $74,500.[4] This contract for sale was apparently negotiated at arms-length through a broker. The closing date for the sale of the property from Guber to Hughes and Frates was July 9, 1992. On that date, Colonial sold the property to Guber[5] for the $60,744 that it paid for the property. Colonial then assigned the sheriff's deed that it received at the foreclosure sale to Guber who, now having obtained title to the property, closed the deal with Hughes and Frates and gave them a warranty deed. After the closing occurred, Guber and his present wife received a check for approximately $8,000, representing the net profit that was realized from the sale of the property.[6]

### The Proceedings in the Bankruptcy Court

As a result of the March 10, 1992 foreclosure sale, instituted by Colonial because of appellant's failure to make the mortgage payments, appellant was faced with a deficiency of approximately $15,000 that was owed to Colonial, the assignee of the original mortgage. On March 3, 1993, fifty one weeks after the foreclosure sale to Colonial, appellant filed a chapter 11 proceeding because of his insolvency and this debt. He subsequently instituted an adversary proceeding in the bankruptcy court against the appellees seeking to avoid the transfer of his property, claiming that the foreclosure sale amounted to a fraudulent conveyance under § 548 because it was sold for less than a "reasonably equivalent value." 11 U.S.C. § 548(a)(2)(A) (1988).

Appellee Colonial filed a motion for summary judgment in the adversary proceeding, which was joined by all other appellees. After a hearing, the bankruptcy court granted the motion and entered judgment for the appellees, making specific findings of fact and conclusions of law in the process. The tenth finding of fact was that the $60,744 bid by Colonial at the foreclosure sale was in fact the reasonably equivalent value of the property, and the eleventh finding was that the sale was conducted in accordance with state law and was non-collusive. In its conclusions of law, the bankruptcy court simply stated that the plaintiff failed to carry his burden of proving that the property was sold for less than a reasonably equivalent value and that there were no genuine issues of material fact that precluded the entry of summary judgment. The bankruptcy court then dismissed the adversary proceeding.

---

ing the purchaser the purchase price plus interest.

If the debtor does not redeem the property within the ninety day period, then § 1–18–104(a) provides a thirty day redemption period for junior creditors or lienholders. If no action is taken within that thirty day period, then the purchaser at the foreclosure sale obtains full title to the property.

In the present case, the foreclosure sale occurred on March 10, 1992. The bankruptcy court expressly found that appellant's redemption period ended on June 10, 1992 which implies that the junior redemption period ended on July 10, 1992.

4. In essence, Guber entered into a contract to sell the subject property at a time when he owned absolutely no interest in that property. It appears that he intended to purchase the property from Colonial by obtaining junior redemption rights, exercising those rights and then re-selling the property to Hughes and Frates after having obtained title through redemption.

In an effort to obtain junior creditor's rights to redeem the property, Guber filed a lien against the property on June 9, 1992 in the amount of

$547 for repairs that he allegedly performed. Appellant claims that he never contracted with Guber for him to perform any services on his property. Guber contends, however, that he was given permission by appellant's first wife to enter the premises and do the repairs that he did. Curiously enough, appellant's first wife never even had an interest in this property since appellant did not purchase it until after he was divorced from her.

5. Guber apparently used the lien that he had filed against the property to claim junior redemption rights and on July 9, 1992, he exercised those rights to purchase the property from Colonial. He was thus able to obtain title prior to closing with Hughes and Frates.

6. Guber received $74,500 from the buyers Hughes and Frates but paid Colonial only $60,744 for the property. Thus, his gross profit from the transaction was $13,756 while his net profit after all expenses were deducted was approximately $8,000.

It is this order of the bankruptcy court dismissing the adversary proceeding and granting summary judgment in favor of the appellees that forms the basis for this appeal.

## Standard of Review

 This court exercises *de novo* review over the bankruptcy court's conclusions of law. *See In re Mullet*, 817 F.2d 677, 679 (10th Cir.1987). The bankruptcy court's findings of fact are, however, subject to more deferential review under the "clearly erroneous" standard. *See Hall v. Vance*, 887 F.2d 1041, 1043 (10th Cir.1989); *In re Branding Iron Motel*, 798 F.2d 396, 399 (10th Cir.1986); Fed.R.Bankr.P. 8013. A finding of fact is clearly erroneous if, after reviewing the record, the reviewing court is left with the "definite and firm conviction that a mistake has been committed." *In re Hart*, 923 F.2d 1410, 1411 (10th Cir.1991) (citation omitted).

## Discussion

The starting point for the Court's analysis of this question is, of course, the language of the statute itself. *See In re Bundles*, 856 F.2d 815, 821 (7th Cir.1988); *In re Lindsay*, 98 B.R. 983, 989 (Bankr.S.D.Cal.1989). Section 548 provides, in relevant part, that:

(a) [t]he trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

. . . .

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation . . .

11 U.S.C. § 548(a)(2)(A) (1988). This section of the bankruptcy code permits the debtor [7]

7. 11 U.S.C. § 522(h) (1988) permits a debtor to seek avoidance of a transfer under § 548 if the trustee has not done so. *See Bundles*, 856 F.2d at 816 n. 1.

8. The Court is aware that during the 1984 amendment process, Congress considered an amendment to the bankruptcy code that would have essentially codified one interpretation of this phrase, the so-called *Madrid* rule, discussed below, rather than having the phrase be subject

to set aside a transfer of property if: (1) the debtor had an interest in the property transferred; (2) the debtor was insolvent at the time of the transfer or became insolvent because of the transfer; (3) the transfer occurred within one year of the filing of the bankruptcy petition; and (4) the transfer was for less than a "reasonably equivalent value." *See Bundles*, 856 F.2d at 815–16; *In re BFP*, 974 F.2d 1144, 1147 (9th Cir.1992), *cert. granted*, —— U.S. ——, 113 S.Ct. 2411, 124 L.Ed.2d 635 (1993).

In the present case, the parties have implicitly conceded the first three requirements, namely, that Gantz did have an interest in the property, that he became insolvent because of the transfer and that the transfer occurred within one year of the filing of Gantz's bankruptcy petition. Thus, the only issue presented by this appeal is whether Gantz, the debtor/appellant, received less than a "reasonably equivalent value" for the property in question.

### A. Defining the Phrase "Reasonably Equivalent Value"

 As an initial matter, the responsibility for interpreting this phrase has been left to the judiciary because Congress chose not to define it in the bankruptcy code.[8] *See In re Morris Communications NC, Inc.*, 914 F.2d 458, 466 (4th Cir.1990). As a result, this Court is faced with a difficult task, one which has divided the numerous bankruptcy, district and circuit courts which have addressed this issue.

Three different lines of common law authority have developed over the years, each espousing a different interpretation of the phrase "reasonably equivalent value." The Court will begin its discussion with a review of these cases.

to multiple interpretations, as demonstrated by the discussion below. *See In re Verna*, 58 B.R. 246, 250 (Bankr.C.D.Cal.1986). This provision, however, was not enacted.

While courts often attempt to impute some significance or meaning to legislative inaction, this Court believes that "[n]othing more can be or should be read into the clear statutory language where Congress has not acted." *Lindsay*, 98 B.R. at 990.

The first line of cases has evolved from the decision in *Durrett v. Washington Nat'l Ins. Co.*, 621 F.2d 201 (5th Cir.1980). *Durrett* was decided under § 67(d) of the former bankruptcy code, 11 U.S.C. § 107(d), which used the phrase "fair consideration," rather than "reasonably equivalent value." [9] In reversing the trial court's ruling that a sale price of 57.7% of the fair market value of the property was fair consideration, the Fifth Circuit stated that it had been unable to find any cases upholding a sale of property at less than 70% of the fair market value of the property.[10] *Id.* at 203. The court's reference to 70% as a cutoff has led other courts and commentators to interpret that case as establishing a bright-line rule, the so-called "*Durrett* 70% rule." The *Durrett* rule implies that if the sale is for 70% or more of the market value, then it is reasonably equivalent value as a matter of law under § 548; if, however, the sale is for less than 70% of the market value, it is not reasonably equivalent value and the transfer can be avoided.[11]

*Durrett* has been criticized. One court stated that its analysis was inadequate because it failed to "take mitigating circumstances into account such as the nature of the market at the time of the sale." *In re Ad-*

*war*, 55 B.R. 111, 113 (Bankr.E.D.N.Y.1985). Still another court declared that *Durrett* was inadequate because "[v]alue is an elusive concept.... For this reason alone, courts should be loath to rule on the validity of a foreclosure sale based solely upon whether the sale achieves a given percentage of value." [12] *In re General Indus., Inc.*, 79 B.R. 124, 130 (Bankr.D.Mass.1987).

These criticisms led to the seminal decision of *In re Madrid*, 21 B.R. 424 (9th Cir. BAP 1982), where the Bankruptcy Appellate Panel of the Ninth Circuit was the first court to explicitly reject *Durrett*'s analysis. In this decision, which has become the landmark decision for the second line of interpretation of this statute, the court noted that because the purpose of fraudulent conveyance law in this context is to prevent a debtor from taking deliberate action to hinder, delay or defraud his creditors, *see Bundles*, 856 F.2d at 818 (citations omitted), "a regularly conducted sale, open to all bidders and all creditors, is itself a safeguard against the evils of private transfers to relatives and favorites." *Madrid*, 21 B.R. at 426–27. The *Madrid* court went on to hold that:

See In re Madrid, 21 B.R. 424, 426 (9th Cir. BAP 1982), aff'd on other grounds, 725 F.2d 1197 (9th Cir.1984), cert. denied, 469 U.S. 833, 105 S.Ct. 125, 83 L.Ed.2d 66 (1984). For reasons that will become evident later, this distinction between public and private sales is critical and thus, Schafer does not dispose of the case at bar.

**9.** Section 67(d) was the direct predecessor of the statute at issue in this case, § 548(a)(2)(A).

**10.** The sole case cited in *Durrett* with respect to the 70% rule was the Tenth Circuit's decision in *Schafer v. Hammond*, 456 F.2d 15 (10th Cir. 1972). In *Schafer*, the Tenth Circuit affirmed the district court's holding that a sale of property for approximately 50% of the fair market value was not fair consideration.

To the extent that *Schafer* is controlling precedent of this circuit in this case, this Court believes that it is distinguishable from the facts of the case at bar. The critical distinction between *Schafer* and the vast majority of the other cases addressing this issue, including this particular case, is that *Schafer* involved a purely private sale by the debtor corporation to the mother of the principal stockholder of the debtor corporation, and not a public sale. As one court noted: we assume that the cases upon which *Durrett* fashioned the 70% fair market value rule were all voluntary, private transfers such as in *Schafer*.

However valid it may be to hold that less than 70 percent of fair market value is not a fair equivalent for a private transfer to an insider, application of that standard to regularly conducted public sales is questionable.

**11.** As noted, the figure of 70% had no special significance to the *Durrett* decision. One court called the reference to 70% in that opinion "the purest form of dictum." *In re Grissom*, 955 F.2d 1440, 1444 (11th Cir.1992).

Another court re-characterized the approach taken in that case and stated that the court was in essence "analyzing the question of reasonably equivalent value in terms of whether the foreclosure sale price is some acceptable percentage of the fair market value of the property." *Bundles*, 856 F.2d at 820. The *Bundles* court thus interpreted the critical aspect of *Durrett* to be its focus on the ratio of the sale price to the fair market value of the property, and not the rather arbitrary 70% cutoff.

**12.** As Justice Brandeis once noted, "[v]alue is a word of many meanings." *Missouri ex rel. Southwestern Bell Tel. Co. v. Public Serv. Comm'n*, 262 U.S. 276, 310, 43 S.Ct. 544, 554, 67 L.Ed. 981 (1923) (Brandeis, J., concurring).

the consideration received at a non-collusive, regularly conducted public sale satisfies the 'reasonably equivalent value' requirement of 11 U.S.C. § 548(a)(2) ...

*Id.* at 425. The court was concerned by the fact that *Durrett* might radically restructure state foreclosure law since the inadequacy of the price is generally insufficient to upset a foreclosure sale under state law. *Id.* 21 B.R. at 426–27. Thus, the *Madrid* court held that the proper inquiry for determining whether a foreclosure sale was for reasonably equivalent value was essentially procedural in nature: was the sale conducted in accordance with the state's foreclosure laws and was it non-collusive; if so, then the sale was for reasonably equivalent value and should not be set aside.[13]

The third approach was first enunciated in the *Bundles* case. In *Bundles,* the Seventh Circuit took a plain language approach to the interpretation of this statute. It began by noting that the plain language of § 548(a)(2)(A) "makes no distinction between sales that do and do not comply with state law." *Bundles,* 856 F.2d at 821. The Court then went on to clarify a point that had apparently been overlooked in earlier cases. Relying on the decision in *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979), the appellee in *Bundles* argued that state foreclosure law should itself provide the substantive rule of decision. The issue in *Butner* was whether the right to rents collected during the period between the debtor's filing for bankruptcy and a foreclosure sale of the property at issue should be determined by a federal rule of equity or by state law. The Supreme Court held that where Congress has not exercised its constitutional power to establish laws governing bankruptcies,[14] state law should be applied.

The *Bundles* court correctly noted that *Butner* was inapposite to the case before the court because Congress *had* in fact legislated in this case, by enacting § 548, and thus had not seen fit to leave this determination to the vagaries of state law. As a result, the *Bundles* court correctly stated an important point: § 548(a)(2)(A) established a *federal* standard of reasonable equivalence, which was independent of state law, for setting aside a foreclosure sale. *Bundles,* 856 F.2d at 823.

After declaring that the interpretation of reasonably equivalent value was to be guided by a federal standard, the *Bundles* court was then faced with the task of defining that standard. The court expressly rejected the notion that state law should be borrowed and thus, that state law should in effect provide the applicable federal rule of decision. As the court stated, "we must reject the view that state law, *either directly or as the federal rule of decision,* should determine the outcome of a bankrupt's complaint under section 548(a)(2)(A)." *Bundles,* 856 F.2d at 822. *But see In re Bennett,* 154 B.R. 140, 146 (Bankr.N.D.N.Y.1992) (noting that *Bundles* held that § 548 established a federal rule of decision, and that it rejected the possibility of borrowing state law as the federal rule of decision, but concluding that state law should nonetheless be borrowed as supplying the federal rule of decision).

The Court then concluded that both *Durrett* and *Madrid* were improper because they both applied irrebuttable presumptions in a mechanical and overly simplistic manner, focusing exclusively on either the price/fair market value ratio—*Durrett*—or on compliance with state procedures—*Madrid.* The court rejected these two extremist views, noting that no specific formula could be used to determine "reasonably equivalent value" and instead, took the "middle ground," adopting a "case-by-case" approach focusing

---

13. The Ninth Circuit affirmed the Bankruptcy Panel's decision, but on other grounds. Specifically, the Ninth Circuit held that a foreclosure sale was not a "transfer" under the statute and therefore, it did not address the merits of the reasonably equivalent value argument. *See Madrid,* 725 F.2d at 1199.

The 1984 amendments to the bankruptcy code declared that a foreclosure sale was indeed a transfer and thus overturned the Ninth Circuit's holding. The Bankruptcy Appellate Panel's holding on the reasonably equivalent value issue, however, remains intact. *See In re Ehring,* 91 B.R. 897, 901 (9th Cir. BAP 1988), *aff'd,* 900 F.2d 184 (9th Cir.1990).

14. *See* U.S. Const. art. I, § 8, cl. 4.

on the "all the facts of each case." [15] *Bundles,* 856 F.2d at 824. The Court did state that the inquiries mandated by *Durrett* and *Madrid* were relevant, but that they should not be viewed as dispositive.[16] The court opted for a more flexible approach that would give lower courts discretion to consider other factors specific to the particular case at hand. Those factors include "whether there was a fair appraisal of the property, whether the property was advertised widely, and whether competitive bidding was encouraged." *Id.*

Needless to say, these three lines of authority have all been followed to some extent by other courts that have considered this issue. *Durrett* has been followed by various bankruptcy courts. *See, e.g., In re Thrifty Dutchman Inc.,* 97 B.R. 101, 108 (Bankr. S.D.Fla.1988); *In re Cole,* 81 B.R. 326, 329–30 (Bankr.E.D.Pa.1988); *In re IPI Liberty Village Assoc.,* 92 B.R. 882, 884 (Bankr. W.D.Mo.1987); *In re Wheeler,* 34 B.R. 818, 821 (Bankr.N.D.Ala.1983); *In re Berge,* 33 B.R. 642, 649–50 (Bankr.W.D. Wis.1983); *In re Thompson,* 18 B.R. 67, 70 (Bankr. E.D.Tenn.1982).

*Madrid* has been adopted by other courts. *See, e.g., In re BFP,* 132 B.R. 748, 750 (9th Cir. BAP 1991), *aff'd,* 974 F.2d 1144, 1148–49 (9th Cir.1992); *In re Winshall Settlor's Trust,* 758 F.2d 1136, 1138–39 (6th Cir.1985); *Bennett,* 154 B.R. at 146–47; *In re Upham,* 48 B.R. 695, 697 (Bankr.W.D.N.Y.1985); *In re Strauser,* 40 B.R. 868, 870 (Bankr. N.D.Ohio 1984).

*Bundles,* however, appears to be the majority view. *See, e.g., Grissom,* 955 F.2d at 1445 ("our decision ... coincides with the majority of the circuit courts which have considered this issue."); *Morris Communications,* 914 F.2d at 467 ("We accept the majority view on the meaning of reasonable equivalence in this context."); *Bennett,* 154 B.R. at 145 ("The *Bundles* position has been adopted in one form or another in a majority of jurisdictions in which the issue has arisen."). *Bundles'* analysis has been adopted by the Courts of Appeals for the Third, Fourth, Seventh, Eighth and Eleventh Circuits, as well as various lower courts within other circuits. *See, e.g., Grissom,* 955 F.2d at 1445–47 (discussing *In re Littleton,* 888 F.2d 90, 93 (11th Cir.1989)); *Barrett v. Commonwealth Fed. Sav. & Loan Ass'n,* 939 F.2d 20, 23–25 (3d Cir.1991); *Morris Communications NC, Inc.,* 914 F.2d at 466–67 (adopting *Bundles* in the Fourth Circuit); *Bundles,* 856 F.2d at 824; *In re Hulm,* 738 F.2d 323, 327 (8th Cir.), *cert. denied,* 469 U.S. 990, 105 S.Ct. 398, 83 L.Ed.2d 331 (1984); *In re Henry–Luqueer Properties, Inc.,* 145 B.R. 771, 774–75 (Bankr.E.D.N.Y.1992); *In re National Envtl. Sys. Corp.,* 111 B.R. 4, 9 (Bankr. D.N.H.1989); *In re Pruitt,* 72 B.R. 436, 444–46 (Bankr.E.D.N.Y.1987); *Adwar,* 55 B.R. at 114–15; *In re Richardson,* 23 B.R. 434, 448 (Bankr.D.Utah 1982).

Finally, some courts appear to endorse a hybrid approach which is, in its practical effect, most analogous to *Bundles.* This line of cases involves a three-step approach, whereby the court first conducts a *Madrid*-based inquiry into the procedural propriety of the sale. Second, the court applies a *Bundles* inquiry, evaluating the totality of the circumstances in an effort to determine whether "commercially reasonable steps were taken to achieve the best price at the foreclosure [sale]." *Lindsay,* 98 B.R. at 991. If such steps were taken, then no further examination is required and the sale should not be avoided. As the *Lindsay* court noted, "[t]here is no question that situations may

---

**15.** This holding was foreshadowed by Judge Volinn, the dissenting judge in the *Madrid* Bankruptcy Appellate Panel decision. Judge Volinn stated that "I believe that the concept of 'reasonably equivalent value' as a test set for 11 U.S.C. § 548(a)(2)[ (A) ] requires that the trial court examine the consideration received in such a sale in the factual context of a particular case." *Madrid,* 21 B.R. at 428 (Volinn, J., dissenting) (footnote omitted).

**16.** The *Bundles* court clearly acknowledged that *Durrett* and *Madrid* were relevant. It stated that

"in usual circumstances, it would be appropriate to permit a *rebuttable* presumption that the price obtained at the foreclosure sale represents reasonably equivalent value.... on the other hand, we ... expect the bankruptcy court ... to accord respect to the state foreclosure sale proceedings." *Bundles,* 856 F.2d at 824–25.

This view has been echoed by most, if not all, of the courts that have adopted *Bundles'* reasoning, cited below.

occur in which a low percentage of fair market value is achieved even after employing sales efforts which are commercially reasonable for a forced sale." *Id.* If, however, the court finds that the creditor failed to take commercially reasonable steps to achieve the best possible price, then the court must attempt to determine what effect that failure had on the actual price achieved. If the effect is significant enough, then the sale may be avoided on the grounds that the sale did not produce a reasonably equivalent value.

This Court considers this approach to be similar to *Bundles* because, as the *Lindsay* court again noted:

> [i]n utilizing this three-part inquiry, the Court is not elevating compliance with state foreclosure standards above all else. Neither is the Court looking solely to percentage of fair market value achieved. Rather, the Court will examine the price obtained at a foreclosure sale only when [it is] persuaded that the foreclosing creditor failed to take commercially reasonable efforts to achieve the best price.

*Id.; see also Henry–Luqueer,* 145 B.R. at 775 (following *Lindsay* and focusing on the "commercial reasonableness" of the sale rather than the price achieved); *Brown v. Vanguard Holding Corp.,* 119 B.R. 413, 414–15 (S.D.N.Y.1990) (following *Lindsay* ); *General Indus.,* 79 B.R. at 132–34 (focusing on the "commercial reasonableness" of the foreclosure sale). *But see Bennett,* 154 B.R. at 146 (criticizing this line of cases for "emasculating state foreclosure sale laws by imposing upon them a standard of commercial reasonableness").

In sum, various courts have adopted different interpretations of the statutory provision at issue in this case. No authoritative ruling exists from the Tenth Circuit, however, and thus, this Court must interpret the statute based on the persuasive authority that exists.[17]

These conflicting and divergent interpretations of the phrase "reasonably equivalent value" illustrate that there is more at stake here than meets the eye. The question presented by this case encompasses an issue much more fundamental and philosophical than a simple question of statutory interpretation. This case raises questions regarding federalism and due regard and respect for the rights of the states to regulate the foreclosures of real property within their borders, without interference by the federal government.

There can be no dispute that § 548(a)(2)(A) is most accurately described as a "federal statutory basis for avoiding a foreclosure sale." *Bundles,* 856 F.2d at 823. Yet it is hard to imagine an area of law more within the province of a state's regulatory powers than the law regarding real property. *See, e.g., Zajac v. Federal Land Bank of St. Paul,* 909 F.2d 1181, 1183 (8th Cir.1990) (*en banc*) (citing *Harper v. Federal Land Bank of Spokane,* 878 F.2d 1172, 1177 (9th Cir. 1989), *cert. denied,* 493 U.S. 1057, 110 S.Ct. 867, 107 L.Ed.2d 951 (1990)). It has been stated that the law regarding foreclosures is one area that is "traditionally controlled by state law." *Harper,* 878 F.2d at 1177 (citation omitted). Nonetheless, § 548 is a "Law of the United States" and must be afforded stature as the "supreme Law of the Land" under the Supremacy Clause of the Constitution, notwithstanding any contrary policies with which this Court might not agree. U.S. Const. art. VI.

It is apparent that the issue presented by this case implicates and involves both "statutory interpretation and the growing tension between pre-emption and the requirements of a vigorous federal system." *BFP,* 974 F.2d at 1149 (footnote omitted). Each of the interpretations of § 548(a)(2)(A) has been criticized by proponents of the others. For example, as noted above, *Durrett* is often seen as too mechanical and, moreover, it focuses on "value," an elusive and amorphous concept. *Madrid,* on the other hand, has often been criticized because, as one court summarized:

> Nonetheless, the case has not yet been decided and thus does not provide this Court with any additional guidance.

---

**17.** As noted, the United States Supreme Court granted the petition for a writ of certiorari in *In re BFP,* a 1992 decision from the Ninth Circuit, apparently to resolve the conflict in the circuits.

if federal courts feel compelled to cloud state foreclosure sales with the application of § 548, then bidders at foreclosure sales will disappear, titles to real estate will become uncertain, and the entire foreclosure market will come crashing down, with chilling effects to the lending market and the economy.

*General Industries,* 79 B.R. at 131 (citing *In re Ristich,* 57 B.R. 568, 577 (Bankr.N.D.Ill. 1986)); *see also Abramson v. Lakewood Bank & Trust Co.,* 647 F.2d 547, 550 (5th Cir.) (Clark, J., dissenting), *cert. denied,* 454 U.S. 1164, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1981); *Bundles,* 856 F.2d at 822 n. 12; *In re Alsop,* 14 B.R. 982, 987–88 (Bankr.D. Alaska 1982), *aff'd,* 22 B.R. 1017 (D.Alaska 1982). Finally, *Bundles* has been criticized on the grounds that its *ad hoc,* case-by-case approach is too unpredictable and that it lacks finality. *See BFP,* 974 F.2d at 1148–49 (citation omitted).

▪ While the Court is certainly cognizant of the policy arguments in support of and in opposition to these various interpretations, the Court's role is limited to giving effect to the language of the statute when that language is clear and unambiguous. Policy implications one way or the other are more appropriately addressed to the representative branches of government. As the Supreme Court has stated time and time again:

> the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, and if the law is within the constitutional authority of the law-making body which passed it, the sole function of the courts is to enforce it according to its terms.

*Central Trust Co. v. Official Creditors' Comm. of Geiger Enters.,* 454 U.S. 354, 359–60, 102 S.Ct. 695, 697–98, 70 L.Ed.2d 542 (1982) *(per curiam)* (quoting *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917)); *see also Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981) ("When we find the terms of a statute unam-

biguous, judicial inquiry is complete."); *In re Sinclair,* 870 F.2d 1340, 1341–42 (7th Cir. 1989) (Easterbrook, J.) (collecting cases).

This Court is persuaded by the textual approach taken by the *Bundles* court, which, like this Court, focuses on the express language of the statute. The *Bundles* court held that "[i]mplying an irrebuttable presumption [under *Madrid* ] would be inconsistent with [the plain language of the statute]." *Bundles,* 856 F.2d at 823. The *Bundles* court reasoned that the statute mandates an inquiry into the "value" of the consideration given in a particular case, and that the *Madrid* court's exclusive focus on compliance with state procedures effectively amounted a judicially created "exception to the trustee's avoiding powers under section 548(a)(2)(A)— an exception not otherwise found in the statute—for property sold at a foreclosure sale." *Id.* Another court noted that not only was the use of an irrebuttable presumption contrary to the language of the statute, it was also contrary to the express purpose for enacting that statute. In *Richardson,* the court insightfully stated that "fixing an irrebuttable presumption of reasonable equivalence for non-collusive, regularly conducted public sales proscribes the factual inquiry into reasonable equivalence which Section 548(a)(2) was designed to facilitate." *Richardson,* 23 B.R. at 446; *see also Madrid,* 21 B.R. at 428 (Volinn, J., dissenting) ("By concluding that a regularly conducted sale in the absence of collusion satisfies the 'reasonably equivalent value' test, the majority has excised vital language from § 548 in order to create an exception to the statute where a forced sale of the debtor's property is involved. There is nothing in the [bankruptcy code] nor its legislative history to suggest that such an exception was intended.").[18]

As a result, this Court believes that the analysis set forth in *Bundles* is the correct interpretation of the phrase "reasonably equivalent value." Indeed, even the Ninth Circuit, which decided *Madrid,* has acknowl-

---

18. While it is true that the term "value" is not necessarily amenable to precise definition, "value" in this context must mean, at a minimum, "a fair return in goods, services or money," "valuable consideration," or "a relative worth, utility

or importance." *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (UNABRIDGED) 2530 (1971). What these definitions all have in common is that they mandate a factual inquiry into the relative worth of a particular exchange between parties.

edged that *Bundles*' reasoning is "persuasive." *See BFP,* 974 F.2d at 1148. Moreover, as far as the potential for instability that the *Bundles* line of cases is said to create, this Court has not uncovered any empirical evidence to suggest that a case-by-case approach focusing on numerous factors rather than conclusive, irrebuttable presumptions, is more likely to upset the mortgage market and create economic uncertainty. More importantly, this Court believes that this interpretation is consonant with, and faithful to, the role of a federal court in our tripartite system of government.

### B. *Application to the Case at Bar*

Having determined that the interpretation of "reasonably equivalent value" under § 548(a)(2)(A) should be guided by *Bundles'* totality of the circumstances analysis, this Court must now determine how that analysis applies to the particular facts of this case. The starting point for this analysis must necessarily be the opinion of the bankruptcy court.

The bankruptcy court never stated which interpretation of the statute it had adopted in its three and a half page order of July 23, 1993. Nonetheless, after a careful review of that court's order, this Court concludes that the bankruptcy court applied what this Court perceives to be the correct legal standard, and therefore, its decision must be affirmed.

The bankruptcy court's findings of fact provide useful insight into its analytical approach. The critical findings that it made were that the foreclosure sale was conducted in accordance with Wyoming law; that the property was sold at a non-collusive public auction after proper notice was given; that the appellant's redemption period had expired without him exercising his redemption rights; that the price bid by Colonial was computed in accordance with the guidelines established by the Department of Housing and Urban Development; and finally, that the $60,744 paid was in fact the reasonably equivalent value of the property. Based on these findings, the court concluded that appellant simply failed to carry his burden of demonstrating that $60,744 was not the reasonable equivalent value. Although appellant takes issue with some of these factual findings, the Court concludes that they have not been shown to be clearly erroneous and they will not be overturned.

■ The question then becomes one of determining what conclusion is mandated by these facts under the *Bundles* standard. The bankruptcy court began by properly placing the burden on appellant to demonstrate that the sale price was not reasonably equivalent value, rather than requiring the appellees to show that the price was reasonably equivalent value. The lower court, whether conscious of it or not, followed the statement in *Bundles* that under most circumstances, it is appropriate to permit a *rebuttable* presumption that the price obtained was in fact reasonably equivalent value. *Bundles,* 856 F.2d at 824. Moreover, the decision to indulge this presumption in this case is reinforced by two additional facts: first, that the $60,744 received was almost 81% of the fair market value of the property, which may be considered under *Bundles,* and second, that the sale complied with Wyoming's statutory procedures. The property was fairly appraised; notice was given in the local newspaper once a week for four weeks, as required by law; and although this Court cannot tell whether competitive bidding was actively encouraged, it has been shown that the bidding was non-collusive. Under these circumstances, this Court believes that it was proper to indulge a rebuttable presumption that the price received was the reasonably equivalent value of the property.

■ Appellant attempts to rebut this presumption by arguing that the bankruptcy court overlooked certain critical facts in this case and that those facts warrant reversal of that court's order. Specifically, appellant argues that Guber's conduct in listing and contracting to sell appellant's property during the ninety day redemption period, as well as filing a questionable lien against the property in order to obtain junior redemption rights, deprived appellant of his property interest in his redemption rights. This argument is without merit.

While the actions and motivations of Guber with respect to appellant's property may have been, at the very least, suspicious, ap-

pellant has not shown that any of the appellees, including Guber, took any affirmative steps to hinder appellant's efforts to redeem his property. Counsel for Colonial stated at oral argument that it would have gladly allowed appellant to redeem the property if he had so desired. In essence, appellant is attempting to shift the blame for his failure to redeem the property to the appellees who have not been shown to have interfered in any way with his redemption rights. As noted, while Guber's motive may have been questionable, he took no affirmative steps to inhibit appellant's ability to redeem his property.

In sum, this Court agrees with the conclusion of the bankruptcy court that appellant failed to carry his burden of proving that the price obtained at the foreclosure sale did not constitute reasonably equivalent value. The sale in this case generated 81% of the fair market value of the property and was procedurally sound and non-collusive. Appellant's attempt to shift responsibility for his failure to redeem to the appellees is simply misplaced. Under these circumstances, the decision of the bankruptcy court must be affirmed.

**THEREFORE,** it is

**ORDERED** that the Order of the Bankruptcy Court Granting Appellees' Motions for Summary Judgment and Dismissing the Adversary Proceeding be, and the same hereby is, **AFFIRMED.**